SHANE V. THE KANSAS CITY, ST. JOSEPH & COUNCIL BLUFFS RAILROAD COMPANY, *Appellant.*

**Surface Water, Rights of Adjoining Proprietors Concerning.**

A land owner has no right by erecting an embankment, to stop the natural flow of surface water, or to divert its course so as to throw it upon the land of his neighbor. Overflowed water from a river, in time of flood, is surface water within the meaning of this rule. HOUGH, J., dissenting.

*Appeal from Jackson Circuit Court.*—HON. S. H. WOODSON, Judge.

AFFIRMED.

*B. F. Stringfellow* for appellant.

NAPTON, J.—This action was to recover damages from the defendant for the destruction of five acres of vegetables the plaintiff had in the Missouri River bottom, charged to have been occasioned by the embankment of defendant's road-bed constructed across a slough, without any culvert, by reason of which in the summer of 1873 a rise in the Missouri River and heavy rain-falls in the vicinity were prevented from pursuing their accustomed natural channel to a lake and thence to the river again. By reason of this obstruction, the waters of the overflowed river and the excessive rains were thrown upon the plaintiff's land and destroyed his crops. We insert the testimony and the instructions, from which the points in issue will be more readily ascertained than from the details of the petition.

William Shane, plaintiff, testified as follows: In 1873 I occupied the land described in the petition, which was owned by my wife; had four and one-half acres in cultivation; two acres in corn, one and one-half acres in potatoes, one acre in garden vegetables. All this crop was destroyed on the 7th or 8th day of July by water which had overflowed the banks of the Missouri River. The water in the

river was very high. It overflowed the bank at a low place and passing in, was stopped by the embankment of defendant's land. It then ran along defendant's road to my wife's land and overflowed it, thus destroying my crops· The low place at which the water was obstructed by the road was about half a mile north of my land. The low place or slough was about one hundred feet wide and five or six feet deep, and ran from the river to a lake about a mile, and from the lake again about a mile the slough passed again into the river. Through this the water from overflows of the river in times of flood had passed before the road was built. I went on the land in the spring of 1871, and have lived there from that time to the present. In July, 1873, the water was from three to three and one-half feet deep on the land, and remained two or three weeks. The crops were all destroyed; the house surrounded by water. I was compelled to remove, and could not safely return for eight or nine weeks. There was no tressel or culvert in defendant's road for passage of water at the low place or from thence to plaintiff's land. The water stood on the land as deep as it did in 1867, though in 1867 the water in river was three feet higher. The road was not built in 1867.

On cross-examination, witness said: In 1867 the water came from the low place or slough spoken of on to my land. In 1873 the water was to within one and one-half or two feet of the top of the road. Have known this land since 1866. The water in floods of the Missouri River has been in the slough as far as the road three or four times in that time; never been out of the slough except in 1867 and 1873. The slough was not wet land, but was generally cultivated, never had water in it except from floods in the Missouri River. The bank of the slough is higher on the north side. Think that from highest part of the bank at distance of 100 feet there is a bank two feet high; this is not a steep bank but a gradual rise. 150 yards from highest the ground is two or three feet higher

than lowest, and at 400 yards is four feet higher than lowest. This land is surrounded by higher land.

Austin Chouteau, for plaintiff, testified : Lived in 1873 within 150 yards of plaintiff. Knew his crops : two acres corn, one and one-half acres potatoes, one acre vegetables, all destroyed. Have lived there thirteen years. When the water of the river in time of flood got over its bank before the road was built, it passed through a place called a slough to a lake and thence to the river below. It is about one-fourth of a mile from river to railroad, about mile to lake and about two miles to river below. The slough was, in low places, three to four feet deep; in others, two to three feet and from fifty to 100 feet wide. It ran from the river east and was crossed by the embankment of the road running from north to south. There was no culvert in the road where it crossed the slough.

Cross-examined : Since 1863, the river overflowed its banks at the slough five times; has never overflowed the banks of the slough but twice, viz : in 1867 and 1873. In 1867, 1873 and in 1876, these years are the only times the river water has got in the slough as far as the road. In 1876 it did not get to plaintiff's land. It was one and a half or two feet deep in slough in 1876 at road. In thirteen years the water has only interfered with crops in the slough twice. When the road was made, a ditch was made along the road from the slough to Shane's, by taking earth for the embankment. Through this the water passed to Shane's land. The water in 1867 was three feet higher than in 1873. Water of 1867 overflowed Shane. Water of 1873 would not have overflowed Shane but for the rail road embankment.

Wagner, for plaintiff, testified : The slough starts from the river with high banks. Water is prevented from passing through it by the road. A culvert in the road at the slough would have carried the water into the lake and prevented its overflowing plaintiff's land.

Flint, for plaintiff, testified : Have lived within one

hundred yards of Shane's land since 1865. Know what is spoken of as a slough. It is low ground near the river. It has no distinct banks, As it runs east the banks get higher. At the railroad the north bank is five feet higher than the lowest place. On the south side there is no distinct bank. In some places it seems nearly level; in others about one and a half feet, rising very gradually. It runs east from the river about one mile, and from the lake to the river again below. In 1873 the river overflowed its banks; water came through this low place to the railroad and nearer to plaintiff's land. But for the railroad the flood of 1873 would have passed on east and not have overflowed plaintiff. The water in the river in 1867 was three feet higher than in 1873. The water would have overflowed the banks of the river in 1876 but for an embankment erected by witness and others in 1875 and 1876.

On cross-examination Flint said: Have known the land since 1865. The river overflowed in 1867 and 1873. One other time since 1865, date forgotten, it got out, and part of the distance to the railroad. I yesterday made an examination of the ground with the engineer of defendant. There are several low places, one north of the one spoken of. The slough or lowest ground was in cultivation in 1873 and before that date. The crop in the slough was destroyed in 1873, and would have been in 1875 and 1876 but for embankment. That embankment was of dirt. This bank was highest at the river. The railroad was finished in 1869. There was no water in this low ground then. I think the land in the slough was cleared and inclosed on the east side of the railroad before the road was built. This was lower than on the west side, next the river. It has been in cultivation ever since. The water stayed so long on Shane's land because it had no outlet, his land being lower than adjacent lands.

Lewis, for defendant, testified: I am now employed by defendant as its engineer; have been engaged as a railroad engineer since 1866. A dirt bank is better and safer

as a bed for a railroad than such a bank with a culvert or other opening, if such an opening can be dispensed with. The low place spoken of by the witnesses does not indicate, except in times of great floods in the Missouri River, any necessity for any culvert or opening in the road-bed for the passage of water. At the time of the construction of the road I was employed as an engineer by defendant, and had occasion to know the character of the low ground spoken of. The road at that place was built in the winter of 1868 and 1869. There was no water in this low place at that time. The place spoken as a slough is not wet land, but is merely low ground, its level varying as other low ground along the Missouri; it has no defined banks. I measured its levels yesterday. The ground is highest at the north side. The highest ground at the bank of the railroad is three feet five inches higher than the ground at a distance of 118 feet. Then going south 150 feet from this lowest point it rises gradually one foot eight and a half inches, thence south 100 feet it falls gradually one foot eleven inches, then south 250 feet it rises gradually one foot eight and a half inches, then 200 feet nearly west, thence 480 feet it continues with scarcely perceptible variations, finally attains a height of one foot two inches higher than last point, thence it falls gradually to plaintiff's land, 740 feet, where it is three feet lower than last point. In the whole distance of about 1,900 or 2,000 feet, the level only varies about three feet.

On cross-examination witness said: An embankment is considered safest without a culvert. One reason is that culverts are liable to wash out when floods come, and drift wood and other *debris* may fill the culvert and injure it or the bank adjoining it. I cannot say whether it would have been more expensive to put a stone culvert into this embankment at the time it was built or to make the bank of dirt, because I do not know the relative cost of stone and earthwork at that time. All railroads have a large number of culverts. Two or three that I have built have

16—71

washed out.  I built one on the St. Joseph & Denver road at a place at which water appeared to have flowed, though I could not learn whether any great quantity of water had flowed there.  I suppose this drain commenced about two miles from where the culvert was placed.  I thought it necessary to put a culvert there.  A flood afterward washed it out.  So long as a culvert is in good condition the road-bed is as safe as without it.

Thereupon the court, of its own motion, gave the following instructions to the jury:

1.  If the jury believe from the evidence that for a number of years prior to the building by defendant of its railroad in Clay county, there existed south of plaintiff's premises a natural drain or slough through which the surplus water of the Missouri River, in high stages, usually and naturally passed without overflowing plaintiff's land, and that in constructing its said railroad defendant made an embankment across said drain so as to obstruct and dam up the surplus water of said river so flowing in said drain, and that by reason of said obstruction the surplus water of said river in the year 1873, during a high stage thereof, was by reason of said embankment obstructed, dammed up and precipitated upon the land of plaintiff; thereby destroying or injuring his crops growing or being thereon, and depriving him of the use of the building on the same, then they must find for the plaintiff and assess his damages at the market value of said crops at the time, on the ground, and the monthly value of the buildings during the time he was necessarily deprived of their use, and the necessary expense of removing from and returning to the same, with six per cent interest per annum from the time of said injury, provided the jury also believe from the evidence that the defendant, by the construction of a culvert or other means of escape for said water, at a reasonable expense and without injury to its said road, could have thereby prevented said injury to plaintiff.

2.  Water which escapes from the banks or natural

channel of a running stream by reason of a flood in the stream occasioned by heavy rains or the melting of snow, is not subject to the law applicable to running streams, but is like surface water, and it may be obstructed or its course changed by the erection of banks necessary for a road-bed, without subjecting the defendant to damages for injury caused by such obstruction.

3. If the jury find that the injury complained of was caused by an embankment erected by defendant, and which was a necessary and proper embankment for the construction of defendant's railroad, they will find for defendant.

To the giving of each of which instructions the defendant objected, and, its objection being overruled, excepted.

The defendant, thereupon, asked the court to give the following instructions:

1. If the jury find from the evidence that the obstruction to the flow of water complained of in the petition was an embankment erected by defendant for its road-bed, and that the same was erected several years before said injury and had been used for such road-bed from its erection to the date of such injury, they will find for defendant.

2. The defendant had the right, in constructing its road, to throw up embankments across low places, and thereby to obstruct the passage of water which in times of floods might overflow the banks of a stream and flow against defendant's road, and is not liable for injury from such obstruction.

3. Defendant was not bound to construct culverts or ways for the passage through its road-bed of water, which, in times of floods, should pass out of or over the banks of some stream adjacent to such road but not obstructed by such road-bed, and is not liable for damages caused by such failure.

4. If the jury find that the injury complained of wa

caused by an embankment erected by defendant, and which was a proper embankment for the construction of defendant's road, they will find for defendant.

5. Water which escapes from the banks or natural channel of a running stream, by reason of a flood in the stream occasioned by heavy rains or the melting of snow, is not subject to the law applicable to running streams, but is like surface water, and it may be obstructed by the erection of banks necessary for a road-bed, without subjecting the defendant to damages for injury caused by such obstruction.

6. Defendant had the right to construct its road-bed in the usual and proper manner by throwing up and raising the ground for its way-bed and erecting ditches along the side to keep the water off from the track of the road; and if defendant made its road-bed and ditches with reasonable skill, and plaintiff was accidentally injured thereby by the flow of water overflowing the banks of the Missouri in an excessive flood, as charged in the petition, he cannot recover.

All of defendant's instructions, except the 6th, were refused.

The plaintiff had a verdict for $450, and after a motion for a new trial and in arrest, judgment was entered and an appeal taken to this court. It is hardly necessary to observe to those who are familiar with the decisions in the United States concerning surface water, that an irreconcilable difference of opinion has exhibited itself in regard to the rights and duties of adjoining proprietors of land. This difference may be traced, I imagine, to the great importance attached by the courts on one side to the maxim "*sic utere tuo ut alienum non laedas,*" whilst those adopting a contrary view seem disposed to give unlimited effect to the maxim "*cujus est solum, ejus est usque ad coelum,*" and therefore leave every proprietor to take care of himself, except where living streams are concerned. The case of *McCormick v. K. C., St. Jo. & C. B. R. R.* 70 Mo. 359,

essentially depends on the same principles, governing the present case. The facts in that case, it is true, are quite the converse of those now to be considered, but the principle involved is the same. That case was one where the owner of the dominant heritage collected the surface water, percolating through a thousand channels, by an embankment, into a mass, and through a culvert in the embankment, precipitated it thus accumulated upon the servient or lower heritage. This case is where the owner of the servient heritage, by artificial obstacles stops the flow of the surface water and throws it back from its natural channel upon the owner of the higher ground.

The decision referred to adopts the principles decided in Pennsylvania, New Jersey, Ohio, Illinois, Louisiana, North Carolina and Iowa, said to be traced to the civil law, but from whatever source derived, in our judgment, based upon sound reasons of equity and justice, which are summarily stated by Pothier in the following words: "Each of the neighbors may do upon his heritage what seemeth good to him, in such manner, nevertheless, that he doth not injure the neighboring heritage." *Kauffman v. Griesemer*, 26 Pa. St. 411; *Earl v. DeHart*, 12 N. J. Eq. 280; *Butler v. Peck*, 16 Ohio St. 334; 49 Ill. 487; *Minor v. Wright*, 16 Lou. Annl. 151; *Overton v. Sawyer*, 1 Jones Law R. 308; 21 Iowa 164; *Martin v. Jett*, 12 Lou. R. 501. In the case of *Livingston v. McDonald*, 21 Iowa 164, the supreme court of that State, through that eminent jurist, Judge Dillon, carried the doctrine declared by this court in *McCormick v. K. C., St. Jo. & C. B. R. R.*, to the extent of determining that a subterraneous ditch which increased the quantity of water upon the lower heritage, or, without increasing the quantity, threw it upon the lower field in a different manner from what it would have flowed naturally, made the proprietor of the upper heritage responsible for the damage, and Judge Dillon remarks in conclusion: "We recognize the fact (to use Lord Tenterden's expression) that surface water or slough water is a common enemy which each

land owner may reasonably get rid of in the best manner possible; but in relieving himself he must respect the rights of his neighbor, and cannot be justified by an act having the direct tendency and effect to make that enemy less dangerous to himself and more dangerous to his neighbor. He cannot make his estate more valuable by an act which unnecessarily renders his neighbor's less valuable."

By the same reasoning, as was observed by the supreme court of Illinois in *Gillham v. Madison Co. R. R. Co.*, 49 Ill. 487, the reverse of the proposition must be true, that the owner of the lower heritage cannot, by an embankment or other artificial means, obstruct the natural channel through which the surface water is accustomed to flow, and throw it back upon the upper proprietor. In a later case in Illinois, (*Gormley v. Sanford*, 52 Ill. 160,) the decision in *Gillham v. Madison Co. R. R.* was reiterated, and it was again held that the owner of the servient heritage has no right, by embankment or other artificial means, to stop the natural flow of the surface water from the dominant heritage, and thus throw it back upon the latter. The remarks of Mr. Justice Lawrence in this case are worthy of observation and apply *a fortiori* to the present case, and we, therefore, copy them : " This question has already been decided by this court in *Gillham v. Madison Co. R. R. Co.*        *
*        In the opinion filed in that case we said, although there was a conflict of authorities among the courts of this country, yet the rule forbidding the owner of the servient heritage to obstruct the natural flow of surface water, was not only the clear and well settled rule of the civil law, but had been generally adopted in the common law courts both of this country and in England. Various cases bearing on each side of the question are cited in that opinion, and it is not necessary to cite them again. This rule was thought by this court, in that case, to rest upon a sound basis of reason and authority, and was adopted. We find nothing in the argument or authorities presented in the present case, to shake our confidence in the conclusion at which

we then arrived.   In our judgment, the reasoning which leads to the rule forbidding the owner of a field to overflow an adjoining field by obstructing a natural water course fed by remote springs, applies with equal force to the obstruction of a natural channel through which the surface waters, derived from the rain or snow falling on s uch field are wont to flow.   What difference does it make in principle, whether the water comes directly upon the field from the clouds above, or has fallen upon remote hills and comes thence in a running stream upon the surface, or rises in a spring upon the upper field and flows upon the lower ? The cases asserting a different rule for surface waters and running streams furnish no satisfactory reason for the distinction.   It is suggested in the argument, if the owner of the superior heritage has a right to have his surface waters drain upon the inferior, it would follow that he must allow them so to drain, and would have no right to use and exhaust them for his own benefit or to drain them in a different direction.   We do not see why this result should follow.   The right of the owner of the superior heritage to drainage is based simply on the principle that nature has ordained such drainage, and it is but plain and natural justice that the individual ownership arising from social laws should be held in accordance with pre-existing laws and arrangements of nature.   As water must flow, and some rule in regard to it must be established where land is held under the artificial titles created by human law, there can clearly be no other rule, at once so equitable and so easy of application, as that which enforces natural laws. There is no surprise or hardship in this, for each successive owner takes with whatever advantages or inconveniences nature has stamped upon his land."

I confess, for myself, that, like Mr. Justice Lawrence, I am unable to perceive the distinction between surface water coming, as he says, from the clouds, and that which rises in a spring, especially in this case, where the surface water comes from the Rocky Mountains, a thousand miles

from where the overflow of the Missouri River occurs, oc-
casioned as it is, not by rains or snows in its vicinity, but
by the melting of snows upon the mountains and by the
accession of a thousand tributary streams. But it must
be considered as well settled that this overflow of. the Mis-
souri is what is in law termed surface water.

In *Kauffman v. Griesemer*, 26 Pa. St. R. 408, the in-
structions of the judge who tried the case were, that the
water which the defendant obstructed was not a living
stream, but came from rains and snows, but that the accus-
tomed, though not continuous, flowage of such water was
in the eye of the law a stream and no more to be ob-
structed than if it was a channel of a continuous stream
that never failed. These instructions were approved by the
supreme court, and that court observes that: "The plain-
tiffs had no right to insist upon his receiving waters which
nature never intended to flow there, and against any con-
trivance to reverse the order of nature he might peaceably
take measures of protection." In *Martin v. Riddle*, 26 Pa.
St. 415, Judge Lowrie says: "Where two fields adjoin, and
one is lower than the other, the lower must necessarily be
subject to all the natural flow of water from the upper one.
The inconvenience arises from its position. * * Hence,
the owner of the lower ground has no right to erect em-
bankments whereby the natural flow of the water from the
upper ground shall be stopped, nor has the owner of the
upper ground a right to make any excavations or drains
by which the flow of water is diverted from its natural
channel and a new channel made on the lower ground, nor
can he collect into one channel waters usually flowing off
into his neighbor's field by several channels, and thus in-
crease the wash upon the lower fields."

The supreme court of Ohio, in *Butler v. Peck*, 16 Ohio
St. 343, unhesitatingly adopted the principle thus decided
in Pennsylvania. The question in that case was "whether
an owner of land having upon it a marshy sink or basin
of water, which basin, as to a considerable portion of the

water collected on it, has no outlet, may lawfully throw such water by artificial drains upon the land of an adjacent proprietor." The court say, "We are clear that no such right exists. It would sanction the creation, by artificial means, of a servitude which nature has denied. The natural easement arises out of the relative altitudes of adjacent surfaces as nature made them, and those altitudes may not be artificially changed to the damage of an adjacent proprietor."

In North Carolina, the supreme court, in *Overton v. Sawyer*, 1 Jones L. R. 308, observed: "The defendant had a right to have the water allowed to pass off his land through the natural drain; and when the plaintiff, by means of the embankment across this natural drain, obstructed the water and interfered with this right, the latter (the defendant) had a cause of action against the former, for causing the obstruction."

What is said by the court of errors in New Jersey, in the case of *Earl v. DeHart*, 1 Beas. R. 280, seems to conform to Mr. Justice Lawrence's views in the Illinois case we have cited, and to apply to the slough, or swale, or hollow through which the waters of the river passed when they overflowed its banks, and across which the defendant's road was built. The chancellor says: "The facts admitted in the answer show that this is an ancient stream or water course, and that it is a natural water course, in the etymological use of the term. A water course is defined to be a channel or canal for the conveyance of water, particularly in draining lands. It may be natural, as when it is made by the natural flow of the water, caused by the general superficies of the surrounding land from which the water is collected into one channel, or it may be artificial, as in case of a ditch or other artificial means used to divert the water from its natural channel, or to carry it from low lands, from which it will not flow in consequence of the natural formation of the surface of the surrounding land. It is an ancient watercourse, if the channel through which it naturally runs has

existed from time immemorial. Whether it is entitled to be called an ancient water-course, and as such legal right can be acquired and lost in it, does not depend upon the quantity of water it discharges. Many ancient streams of water, which, if dammed off, would inundate a large region of country, are dry for a great portion of the year. If the face of the country is such as necessarily collects in one body so large a quantity of water, after heavy rains and the melting of large bodies of snow, as to require an outlet to some common reservoir, and if such water is regularly discharged through a well defined channel, which the force of the water has made for itself, and which is the accustomed channel through which it flows and has flowed from time immemorial, such channel is an ancient natural water-course."

The court, therefore, held, that where the surface of the ground is such as to collect water at different seasons of the year to an extent which requires an outlet, and if such is always the case in times of heavy rains and melting snow, and if that flow of water produced a natural channel through the lands of different persons where such accumulated surplus water has always been accustomed to run, a court of equity would protect such channel from obstruction to the injury of any one through whose land it runs. This corresponds with the view of the judge in *Kauffman v. Griesemer*. The judge who tried this case observes: "The declaration speaks of a stream of water being used to flow. There is no stream in the usually received sense of that word, as being a continuous flowage of water. The water that flowed down was such as came from springs which do not seem ever to have had a continuous flow that reached defendant's land, and such as came from rains and snows. But the accustomed, though not continuous flowage of water, is a stream in the eye of the law, and its channel is no more to be obstructed than if it was the channel of a stream that never failed.      *

      *      Whatever is the natural direction of the excess

of waters in floods and freshets, as in seasons of ordinary water, must be left as nature has made it; no one has a right to divert it from himself and cast it upon his neighbor to save himself at the expense of another."

Of course the immemorial usage spoken of in the New Jersey case can hardly be claimed here, since there was no witness in the case who spoke of having any knowledge of the river floods beyond thirteen years before the trial, but the question as to this slough being the natural channel through which the waters of the Missouri River passed in times of floods, was put to the jury in an instruction given by the court, and was found by the jury, and upon the evidence submitted, they could not have found otherwise than they did, for upon this point all the witnesses were agreed, though they could not speak of time immemorial, beyond which the memory of man did not reach.

The principles which are at the bottom of this case, if taken from the civil law, a system which, as Judge Dillon remarks in *Livingston v. McDonald*, " embodies the accumulated wisdom and experience of the refined and cultivated Roman people for a thousand years, and though not binding as authority, is of great service to the inquirer after the principles of natural justice and right," and from which many of the usages of the common law and equity courts both in England and this country are derived, were recognized by this court as early as the case of *Laumier v. Francis*, 23 Mo. 181, in which the opinion of this court was delivered by Judge Leonard, when associated with Judges Scott and Ryland, all three of whom are well known in this State, and have been in the front rank of our most eminent jurists.

We deem it unnecessary to refer particularly to the decisions in Louisiana, as they are uniformly in conformity with the principles of the cases already cited from Pennsylvania and other States. On the other hand, the cases in Massachusetts and several other of the New England States, following the case of *Gannon v. Hargadon*, 10 Allen 106,

adopt the rule of allowing every proprietor to control surface water as he pleases, without regard to contiguous proprietors. Still, as even in these States this right is carefully distinguished from similar rights where a water course exists by grant or prescription, it is not entirely certain how the courts would apply these doctrines to a case like the present. So in New York the general principle asserted in *Gannon v. Hargadon* seems to be maintained in *Goodale v. Tuttle*, 29 N. Y. 459, where Judge Denio says: "In respect to the running off of surface water,        *   * I know of no principle which will prevent the owner of land from filling up the wet and marshy places in his own soil for its amelioration and his own advantage, because his neighbor's land is so situated as to be incommoded by it." This is a mere reiteration of the doctrine of "*sauve qui peut*," or as propularly translated into our vernacular "the devil take the hindmost." We prefer that asserted by this court in *Laumier v. Francis*, and repeated in *McCormick v. K. C., St. Jo. & C. B. R. R.*

Nor do we think that equitable and just principles, as we understand it, will materially retard agricultural operations or improvements. The facts in the present case show that the defendant could have built a rock culvert at the crossing of this hollow, at about the same cost with the dirt embankment. The engineer seems to have been misled by the dry and rich soil which extended to the very bottom or lowest part of the swale, portions of which were in cultivation, and although the road was equally strong and safe with a rock culvert or a dirt embankment, the engineer preferred the latter, as "not so liable to wash out when floods come; and drift wood and other *debris* fill the culvert and injure it or the bank adjoining it." The first instruction given for the plaintiff contained all the law necessary to enable the jury to pass upon the facts submitted, and the second and third, and the sixth given for defendant certainly cannot be complained of by defendant. The

judgment of the circuit court is affirmed. SHERWOOD, C. J., and HENRY and NORTON, JJ., concur.

HOUGH, J., DISSENTING.—I adhere to the opinion of this court in *McCormick v. K. C., St. Jo. & C. B. R. R.*, 57 Mo. 433, the doctrine of which I conceive to be at variance with the rule adopted by my associates for this case. In the case cited, the right of the proprietor of the soil to change the flow, or obstruct the natural course of surface water, is clearly and distinctly announced in the following language: "The general rule, however, is that either municipal corporations or private persons may so occupy and improve their land, and use it for such purposes as they may see fit, either by grading or filling up low places, or by erecting buildings thereon, or by making any other improvement thereon, to make it fit for cultivation or other profitable or desirable enjoyment; and it makes no difference that the effect of such improvement is to change the flow of the surface water accumulating or falling on the surrounding country so as either to increase or diminish the quantity of such water, which had previously flowed upon the land of the adjoining proprietors to their inconvenience or injury. Ang. Wat. Cour., p. 122, § 108, and following, and cases there cited; *Goodale v. Tuttle*, 29 N. Y. 459; *Waffle v. N. Y. Cen. Ry. Co*, 58 Barb. 413; *Turner v. Inhabitants, &c.*, 13 Allen 291; *Imler v. City of Springfield*, 55 Mo. 119, and cases there cited. The same rule would apply to water flowing over the country, which had escaped from the banks or natural channel of a running stream of water, by reason of a flood in the stream occasioned by heavy rains or the melting of snow upon the surrounding country."

In *Goodale v. Tuttle*, 29 N. Y. 459, cited by Judge Vories in support of his opinion in the case just quoted from, Denio, C. J. said: "And in respect to the running off of surface water caused by rain or snow, I know of no principle which will prevent the owner of land from filling

up the wet and marshy places on his own soil for its amelioration and his own advantage, because his neighbor's land is so situated as to be incommoded by it. Such a doctrine would militate against the well-settled rule that the owner of land has full dominion over the whole space above and below the surface." In *Gannon v. Hargadon*, 10 Allen 106, Bigelow, C. J., said: "The right of an owner of land to occupy and improve it in such manner and for such purposes as he may see fit, either by changing the surface or the erection of buildings or other structures thereon, is not restricted or modified by the fact that his own land is so situated with reference to that of adjoining owners that an alteration in the mode of its improvement or occupation in any portion of it will cause water, which may accumulate thereon by rains and snows falling on its surface or flowing on to it over the surface of adjacent lots, either to stand in unusual quantities on other adjacent lands, or pass into and over the same in greater quantities or in other directions than they were accustomed to flow."

In *Hoyt et al. v. The City of Hudson*, 27 Wis. 656, Dixon, C. J., after stating the rule of the civil law of dominant and servient heritage, which he rejects, proceeds as follows: "The doctrine of the common law is, that there exists no such natural easement or servitude in favor of the owner of the superior or higher ground or fields as to mere surface water, or such as falls or accumulates by rain or the melting of snow, and that the proprietor of the inferior or lower tenement or estate may, if he choose, lawfully obstruct or hinder the natural flow of such water thereon, and in so doing may turn the same back upon or off on to or over the lands of other proprietors without liability for injuries ensuing from such obstruction or diversion. This is the rule in England, and in Massachusetts, New York, Connecticut, Vermont, New Jersey and New Hampshire, as will be seen by the authorities cited in *Pettigrew v. Evansville*, 25 Wis. 223, and also the following: *Bowlsby v. Speer*, 31 N. J. Law Rep. (2 Vroom) 351; *Dick-*

*inson v. Worcester*, 7 Allen 19; *Chatfield v. Wilson*, 28 Vt. 49; *Swett v. Cutts*, 50 N. H. 439; *Trustees v. Youmans*, 50 Barb. 316; *Waffle v. N. Y. Central Ry. Co.*, 58 Barb. 413. Excluding from its operation surface water falling or accumulating on his own land, which, as decided in *Pettigrew v. The Village of Evansville*, the proprietor may not divert or cause to flow upon the land of another to his injury, the rule of the common law is correctly stated in *Bowlsby v. Speer*, that no legal right of any kind can be claimed, *jure naturae*, in the flow of surface water, so that neither its retention, diversion or repulsion is an actionable injury, even though damage ensue. An examination of the last named case will also show that the case of *Earl v. DeHart*, 1 Beas. 280, cited and relied upon in argument here, has been virtually overruled."

In *Bowlsby v. Speer, supra*, Beasely, C. J. said: "The owner of land may, at his pleasure, withhold the water falling on his property from passing in its natural course on to that of his neighbor, and in the same manner may prevent the water falling on the land of the latter from coming on to his own. * * Nor does it seem to me that there is any significance in the fact that there was an appreciable channel for this surface water over the land of the defendant and into which it naturally ran. On every hill-side numbers of such small conduits can be found, but it would be highly unreasonable to attach to them all the legal qualities of water courses. I am not willing to adopt a doctrine which would be accompanied with so much mischief." It appears from the statement of facts in that case, that the defendant built a stable over a hollow on his own land, through which the surface water was accustomed to pass, and this obstacle turned the course of the water, so that it ran on to the lot and into the cellar of the dwelling house of the plaintiff. It was held that the plaintiff had no right of action.

In the case of *Livingston v. McDonald*, 21 Iowa 160, in which a very able and most interesting opinion was deliv-

ered by Judge Dillon, it appeared that the water naturally flowed from the defendant's low or slough land into and upon like land of the plaintiff. The defendant constructed a mole or underground ditch about two hundred yards in length a short distance below the surface, in his slough land, which terminated in an open end or mouth near the land of plaintiff, and thus concentrated the water laterally received by it throughout its whole length and emptied it in a body upon the land of the plaintiff. This Judge Dillon decided the defendant had no right to do. Nor under the common law rule, as laid down in *McCormick v. R. R.*, *supra*, could this have been done. But Judge Dillon by way of caution perhaps, wisely observes in the same case that, "It may be doubted whether the common law courts in this country would adopt what seems to be the rule of the civil law, so far as to preclude the lower owner from making, in good faith, improvements, which would have the effect to prevent the water of the upper estate from flowing or passing away." On a question like that now before us, the decisions in Louisiana cannot be received as authority in this State, since, as is well known, they are based upon positive provisions of the civil code regulating the subject, in force in that State. La. Code, Art. 656. In the case from that State cited in the opinion of the majority, Duffel, J., observes: "This court has, on more than one occasion, expressly declared that a strict and rigid application of the articles of the code on the title of predial servitudes would be destructive to agricultural industry. *Martin v. Jett*, 12 La. 503; *Sowers v. Shiff*, 15 La. Ann. 300." And in the case last cited the same learned judge further said that a strict application of the articles of the code "would condemn to perpetual sterility all the rich lands in lower Louisiana bordering on the Mississippi River."

Judge Redfield in commenting upon the case of *Swett v. Cutts*, 50 N. H. 439, makes the following pointed and emphatic declarations on this subject: "It must be conceded, we think, that the right of land owners to deal

with surface water and all water mixed with the soil, or coming from underground springs, in any manner they may deem necessary for the improvement or better enjoyment of their own land, is most unquestionable, and if by so doing, in good faith and with no purpose of abridging or interfering with any of their neighbors' rights, they necessarily do damage to their neighbors' lands, it must be regarded as no infringement of the maxim, *sic utere tuo ut alienum non laedas*, but must be held *damnum absque injuria*."

But there is a more potent reason for upholding in this State the common law rule on this subject than is to be found in all the learned judgments of the distinguished jurists whose opinions have been cited.   Section 3117 of the Revised Statutes, which has been in force in this State since the year 1816, declares that the common law of England, when not repugnant to the constitution of the United States or the constitution and laws of this State, " shall be the rule of action and decision in this State, any law, custom or usage to the contrary notwithstanding."   While common law judgments are frequently illustrated by reference to the civil law, and while this court is at liberty to resort to any system of jurisprudence for a rule of action when the common law and our statutes fail to furnish one, yet when the common law does furnish a rule, under the statutes cited, I do not conceive that this court is at liberty to disregard it.

*Laumier v. Francis*, 23 Mo. 181, referred to in the opinion of the court, was an action against the defendant for levying a nuisance by accumulating a body of water on a lot in his possession adjoining a building in the possession of the plaintiff.   Judge Leonard, after defining a servitude under the civil law, proceeds as follows :  " We, of course, know nothing about the facts of the present case ; but if such was the natural situation of these lots, and the plaintiff dammed up the water on the defendant's lot, by erecting a house upon his own, it is very obvious that he

cannot recover any damage occasioned thereby to his own property.    *    *    In the case supposed, the plaintiff himself would be the author of the nuisance, and of course could not hold another responsible for the damages that resulted to him from his own act." The judgment of the circuit court, however, was expressly reversed upon another ground, and no decision was, or could have been made upon facts which were not before the court. On the facts supposed, no recovery could have been had under the common law. For example, the defendant in this case could not have recovered damages from any one for injury done to its embankment by the surface water which it had dammed up. Besides, as Judge Leonard cited the case of *Cooper v. Barber*, 3 Taunton 99, in support of his views, there is as much ground for saying that he adopted the common law rule, as there is for saying that he adopted that of the civil law. Neither rule was maintained as against the other in that case.

If the defendant in this case had constructed a culvert or other opening in its embankment for the passage of the flood through it upon the adjoining fields in the swale on the other side of its road, as is suggested in the opinion of the court, I do not see why the defendant would not have been liable for the injury thereby inflicted upon the owners of such fields, under the decision made at the present term in *McCormick v. The K. C., St. Jo. & C. B. R. R.*, (the present defendant) 70 Mo. 359. So that if the company builds an embankment without any opening, it will be liable for the damages arising from the obstructed surface water on one side, and if it constructs an embankment with an opening, it will be liable for the damage done by the surface water passing through it on the other side.

The first and second instructions given for the plaintiff are conflicting. I am of opinion that the second and third instructions asked by the defendant should have been given, and the first given for the plaintiff should have been

refused, and that the judgment of the circuit court should, therefore, be reversed and the cause remanded.