## J. M. WHITSETT et al., Appellants, v. CITY OF CARTHAGE.

### Division One, March 12, 1917.

1. **SEWER: Taxation of Agricultural Lands.** Notwithstanding plaintiff's lands are used largely for agricultural and garden purposes, have not been platted into blocks and lots, constitute 160 of the 1600 acres in the sewer district, and the tax against them to construct the main sewer will be $36 per acre, and if constructed no laterals from it through the lands are at present contemplated, yet if there are 3500 inhabitants residing within the district, there are churches, schools and hospitals, the sewer is to be constructed along the course of natural drainage, the district is now totally without sewers and there is no other feasible method for draining the

Whitsett v. Carthage.

lands included therein, and these agricultural lands within the city limits when laterals are constructed can be drained by the main sewer, its construction will not be enjoined on the ground that the ordinances authorizing it are unreasonable and oppressive.

2. ———: ———: Public Health. All persons hold their property subject to the laws providing for the public health, safety, morals and general welfare; and if a main sewer is necessary for the public health of a large portion of a city, and will benefit not only the parts densely populated but in time the agricultural lands included in the district also, the owners of such lands cannot enjoin its construction on the theory that it is not necessary for the present enjoyment and use of those lands, they cannot be immediately served by it, and the costs to be taxed against them will be very heavy, possibly confiscatory.

3. ———: Benefits. It is not only benefits to real estate that are to be considered in sewer construction. Primarily the benefits are conferred on all the people of a district, through sanitation and health conservation, and secondarily on the real estate taxed with the cost, in that it is made more desirable for business and residential purposes and increased in value.

4. ———: ———: Laterals. The owners of land not reached by lateral sewers are benefited by laterals which connect other improved lands in the district with the main sewer, since they serve to drain away the refuse that would endanger the public health.

5. ———: Laterals: Time of Construction. The law does not require all lateral sewers of a drainage district to be constructed at the same time. They may be constructed as the necessity for them arises, and not before.

6. ———: Taxes in Proportion to Benefits. The fact that the benefits to lands taxed with the costs of a sewer do not exactly equal such costs will not invalidate the construction or the tax bills. Approximate equality is all the law requires.

7. CITY EXTENSION: Validity. A contention that the city limits were not legally extended to embrace the lands to be taxed with the costs of constructing a main sewer because no notice of the election was given, will not be considered, if fifteen years have elapsed since the extension was made.

Appeal from Jasper Circuit Court.—*Hon. D. E. Blair,* Judge.

AFFIRMED.

*Spencer & Grayston, A. L. Thomas* and *Shannon & Esterly* for appellants.

(1) The foundation of the power to lay a special assessment or a special tax for local improvements of any character, whether opening, improving, or paving a street or sidewalk, or constructing a sewer or cleaning or sprinkling a street, is the benefit which the improvement or service confers on the owner of the abutting property or the owners of the property in the assessment or special taxation district which is different from the general benefit which such owners enjoy in common with the other inhabitants or citizens of the municipal corporation. Walker v. Jamison, 140 Ind. 591, 28 L. R. A. 679, 49 Am. L. R. 222; Union Trust Co. v. Pagan-stretcher, 80 Pa. St. 505, 21 Am. St. 112; Hale v. Kenosha, 29 Wis. 599; McQuillin, Municipal Corp., sec. 2018. Special assessments are explained and their judicial history given in Macon v. Petty, 34 Am. Rep. 457. (2) The whole theory of local taxation or assessments is that the improvements for which they are levied afford a remuneration in way of benefit. A law which would attempt to make one person, or a given number of persons under the guise of local assessments, pay a general revenue for the public at large would not be an exercise of the taxing power, but an act of confiscation. In effect it would be transferring the property of one individual to another. These are the legal truisms which have long been entertained and firmly established. McQuillin, sec. 218; McCormack v. Patchin, 53 Mo. 33; St. Louis v. Clemans, 49 Mo. 552; Garrett v. St. Louis, 25 Mo. 505. (3) The principle underlying special assessments to meet the cost of public improvements is that the property upon which they are imposed is peculiarly benefited, and therefore the owners do not in fact pay anything in excess of what they receive by reason of such improvement. The exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him, is to the extent of such excess, a taking, under the guise of tax-

ation, of private property for public use without compensation. Norwood v. Baker, 172 U. S. 269; McQuillin, sec. 2018; State v. Newark, 37 N. J. L. 415; Hutcheson v. Starrie, 51 S. W. 848. (4) The power to assess private property for public improvements, beyond the uniform rate prescribed by the Constitution, is derivable only from the fact that such property is enhanced in value to the amount of the tax, beyond that of other citizens, by the public betterment. Any assessment not thus bottomed is void. Jaicks v. Oppenheimer, 175 S. W. 972. (5) Although municipal corporations are prima facie the sole judges of the necessity of their ordinances, yet if one is altogether unreasonable and oppressive, it may be vacated for that reason alone. Hannibal v. Tel. Co., 31 Mo. App. 23; St. Louis v. Theater Co., 202 Mo. 699; St. Louis v. Russell, 116 Mo. 258; Salem ex rel. v. Young, 142 Mo. App. 170; State ex rel. v. Terminal Ry., 168 S. W. 1144; Tobacco Co. v. St. Louis, 157 S. W. 502; Zumault v. K. C. Air Line, 71 Mo. App. 676; Carrigan v. Gage, 68 Mo. 545; Lamar v. Weidman, 57 Mo. App. 507; Plattsburg v. Hagenback, 98 Mo. App. 671; Herman v. Handlan, 59 Mo. App. 490; Springfield v. Jacobs, 101 Mo. App. 340; White v. Railroad, 44 Mo. App. 542. (6) While the courts may not interfere with the legitimate use of the legislative power delegated to a municipal corporation, they may interfere to prevent its abuse. Skinker v. Heman, 148 Mo. 355; St. Louis v. Weber, 44 Mo. 550; McCormack v. Patchin, 53 Mo. 33; Carrigan v. Gage, 68 Mo. 541; Halpin v. Campbell, 71 Mo. 493; Kelley v. Meeks, 87 Mo. 401; Tarkio v. Cooks, 120 Mo. 9; St. Louis v. Packing Co., 141 Mo. 375. (7) Where a sewer is constructed mainly for the benefit of the public, the city has no power to pay for its construction by issuing special tax bills. Heman v. Handlaw, 59 Mo. App. 490. (8) The reasonableness of an ordinance extending city limits may be questioned collaterally in a suit to collect a special tax bill. Salem ex rel. v. Young, 142 Mo. App. 170; Springfield v. Jacobs, 101 Mo. App. 340.

*Geo. W. Crowder* and *Allen McReynolds* for re- spondent.

(1) Public improvements are not to be treated as evils which are to be judicially circumvented; hence, laws anent public improvements should be subjected to a reasonable analysis only, with the view that they are passed in the spirit of justice, and for the general welfare of community life, in the interest (as to sewers) of the public health. Gist v. Construction Co., 224 Mo. 397; Waddell Inv. Co. v. Hall, 164 S. W. 541. (2) The controlling test of benefits conferred, where a large area is sought to be drained by means of a trunk sewer for an outlet, is whether the lands included within the benefit district are, by reason of their topography, drainable into such trunk sewer by means of district or lateral sewers. Page & Jones, Taxation by Assessment, sec. 563, p. 917-921, sec. 658, p. 1114; St. Joseph v. Owen, 110 Mo. 445. (a) Such land may be assessed even though the city waterworks has not yet been extended to it. The presumption will be indulged that the city authorities will perform their functions in good faith. Page & Jones, Taxation by Assessment, sec. 563; Mc-Gee v. Walsh, 249 Mo. 266. (b) And, too, though such lands may be unimproved, and unplatted, and may have no occasion to make immediate use of the sewer. Mc-Gee v. Walsh, 249 Mo. 266; Dillon's Municipal Corporations (5 Ed.), sec. 1460; Salem v. Young, 142 Mo. App. 160. (3) Plaintiffs cannot insist upon having the reasonableness of ordinance 103 determined, with respect to the inclusion of their lands, from the viewpoint of the condition in which they have voluntarily left such lands, or from any particular purpose for which they elect to hold such lands. Page & Jones, Taxation by Assessment, secs. 608, 609, p. 1012; Mitchell v. Negaunee, 113 Mich. 359, 76 Am. St. 468; Salem v. Young, 142 Mo.App. 160. (4) Land is benefited by the construction of a sewer, in contemplation of law, when such land is practically susceptible of being drained thereby. Page & Jones, Taxation by Assessment, sec. 563, p. 917.

(5) The broad terms of section 9281 to 9298 inclusive, R. S. 1909, contemplate the assessment of all lands drainable into the proposed trunk sewer, it being designed as an outlet for the entire drainage area, and no ultimate hardship can occur to these plaintiffs thereby. Secs. 9281-9298, R. S. 1909; Page & Jones, Taxation by Assessment, sec. 563, p. 921; McGee v. Walsh, 249 Mo. 266.    (6) It is not compulsory, nor even contemplated, by Secs. 9281-9298, R. S. 1909, under authority of which this proposed system of drainage has been worked out, that district or lateral sewers must be undertaken and constructed at the same time, and in the same connection. Page & Jones, Taxation by Assessment, sec. 327, p. 506.    (7) Assessments may be properly levied to pay for the construction of a trunk sewer for the purpose of affording an outlet for a large drainage area on the theory that all lands drainable thereby are especially benefited by reason of having the means of an outlet for such lateral sewers as may be constructed from time to time. Page & Jones, Taxation by Assessment, sec. 327, p. 506; Bassett v. New Haven, 55 Atl. 579; Alley v. Lebanon, 44 N. E. 1003; Hanscom v. Omaha, 7 N. W. 739; Ford v. Toledo, 59 N. E. 779; Imp. Co. v. Kansas City, 172 Mo. 523.

WOODSON, J.—This suit was instituted in the circuit court of Jasper County by the plaintiff to enjoin the city of Carthage from constructing a main sewer therein in conformity to certain ordinances duly enacted by said city.

The trial resulted in a decree in favor of the defendant, denying the injunction, and after taking proper steps the plaintiffs duly appealed the cause to the Springfield Court of Appeals. Upon motion the cause was properly transferred by that court to this.

The construction of the sewer is resisted principally upon the grounds that the ordinances ordering it are unreasonable and oppressive. This calls for a statement of the substance of the evidence.

The facts of the case are briefly these:

On the first Tuesday in April, 1912, the defendant held an election for the purpose of adopting the provisions of sections 9281 to 9298, inclusive, Revised Statutes 1909, relating to the construction of sewers in cities of the third class, and by virtue of said election, said sections were adopted.

On the 11th day of August, 1913, the defendant passed Ordinance No. 102, dividing the territory of said city into sewer districts, as contemplated by the provisions of said sections 9281 to 9298, inclusive.

On the same day, namely, August 11, 1913, the defendant passed Ordinance No. 103, providing for the construction of a main trunk sewer, to be paid for by special tax bills on the lands belonging to plaintiffs and other lands.

Pursuant thereto, the defendant was about to advertise for bids for the construction of said sewer, when this suit was commenced, June 23, 1915.

The plaintiffs are owners of about 160 acres of land against which the defendant proposes to issue special tax bills to pay for the construction of said sewer.

The plaintiffs' evidence tended to prove that the lands belonging to plaintiffs are occupied and used exclusively as farm lands and for truck gardening, etc.; that they are not held for the purpose of being platted and sold as town lots; that they are not in demand for urban purposes; that the growth of the city in the past twenty-five years has not been such as to indicate that they will, within any reasonable length of time, be in demand for urban uses.

The lands of all the plaintiffs, except the Block forty-acre tract, are in the southwest quarter of section Nine, Township Twenty-eight, Range Thirty-one. The Block forty is the northwest quarter of the northwest quarter of said Section Nine.

The southwest quarter of Section Nine is the extreme southwest portion of the city. While one ten-acre tract in the north-central portion thereof was, many years ago, platted into town lots, it was a failure as a

city addition. No streets or alleys have ever been opened or improved therein, and it is occupied as acreage property. None of the remainder of said quarter section has ever been platted.

The city owns the municipal light plant and waterworks. No portion of the lands belonging to the plaintiffs is provided with electric light or water service. The nearest light is located at the northeast corner of the southwest quarter of said Section Nine. The nearest water plug is located at the corner of Centennial Avenue and Forest Street, about four hundred feet east of the northeast corner of said quarter section. The policy of the city with reference to the extension of its water mains is that no extensions will be made unless the prospective consumption of water will produce an annual income of five per cent of the cost of the extension.

There are only twelve families living on said quarter section, and it would cost several thousand dollars to extend the water mains to all parts of the same, so that the sewers, if constructed, could not be used by any of the plaintiffs.

In 1890, the population of the city was 7,981; in 1900, it was 9,416; in 1910, it was 9,483, and at the time of the trial of the case it was 9,211. About one-half of the unoccupied land within the city limits which is available for and adaptable to residence purposes, is within the proposed sewer district.

The lands belonging to plaintiffs, in the southwest quarter of Section Nine, lie south of Centennial Avenue, and are one-fourth of a mile west of Garrison. The southwest quarter of Section Nine, in which all the lands of plaintiffs lie, except the Block forty, is one-fourth of a mile west of Garrison Avenue. A good portion of the eighty-acre tract extending from Garrison Avenue on the west to Grand Avenue on the east, and from Centennial Avenue on the north to Fairview Avenue on the south, has been platted and offered for sale for the last twenty-five years. The street car track, on which cars are run each way every half hour, runs through this tract, on Main Street from north to south, and along the

south side thereof on Fairview Avenue. A large portion of this territory was settled up twenty-five years ago. At the present time there are only thirty-six dwelling houses on the north forty acres of that eighty-acre tract, and only nine dwellings on the south forty acres of said eighty-acre tract. On the north half of the eighty-acre tract immediately west of Garrison Avenue and south of Centennial Avenue there are only seventeen dwellings, and on the south half of the same there are only nine dwelling houses.

There are only seventeen dwellings on the 160-acre tract immediately east of Grand Avenue and south of Centennial Avenue.

All of the above described tracts embracing one-half section of land are well adapted to urban purposes, and each and every one of them is closer to the center of population of Carthage than any portion of the southwest quarter of said Section Nine.

The evidence also tended to show that some years ago the forty-acre tract immediately south of Fairview Avenue and west of Hazel Avenue was platted into lots and sold at auction, both additions being on the street-car line, and that both additions have been abandoned as urban property, and divided up into acre property and used for farming purposes.

That the system of sewer districts attached and made tributary to the main sewer in controversy contains about 826 acres, and that only about 26 acres the same have close water connection, and that the water mains would have to be extended before the remaining 800 acres could be benefited by the construction of said sewer or by the construction of district sewers to connect therewith; and there is no intimation in the defendant's evidence, or elsewhere in the record, that the city proposes or contemplates the construction of the necessary extension of its mains.

In District 44 there are 87 acres and 5 houses, in District 35 there 68½ acres and 9 dwelling houses. In District 24 there are 140 acres and 24 residences. The

cost of the construction of the main sewer would be
$36.60 per acre.

The evidence shows that the lands belonging to
plaintiffs are worth about $200 per acre, without im-
provements, in five-acre tracts.

The evidence tending to show the facts regarding
the lands in the southwest quarter of Section 9 is also
applicable to the Block forty-acre tract,

Carthage was incorporated under a special charter
in 1873. At that time.the southwest quarter of Section
Nine was not included within its limits. Subsequently
the city attempted to extend its limits so as to include
said territory, but no notice of the election held for
that purpose seems to have been given.

No provision is made by Ordinance No. 103 to con-
struct laterals to connect the lands in controversy with
the proposed sewer and in fact it does not seem to be
the purpose of the city to do so.

The evidence for the defendant tended to show
that the city of Carthage is a city of the third class
under the laws of the State of Missouri. It has a popu-
lation of approximately ten thousand inhabitants, and
lies on a slope south of the banks of Spring River. Its
natural drainage is from the south to the north. The
the distance from the river to the south bluff of Spring
River in the city of Carthage varies from a mile to a
few feet. At the east end of town the limestone bluff
diminishes and disappears. Towards the west side the
bluff comes almost to the river.

The natural drainage of the town is in three areas:
the central area, which is geographically very much
smaller than the rest of it, but which includes the busi-
ness portion of the city; the eastern area, which is
made up of a long draw and its tributaries which drain
the eastern portion of the city; and the western area,
which covers probably half of the geographical area of
the city, and is that territory which is tributary to a
long draw extending from the southern part of the town
in a northwesterly direction to a point outside of the
corporate limits,

The central area has been sewered for a number of years. Recently a sewer was constructed in the eastern portion of the city and that part of the town has the sewerage which is necessary for the proper drainage of a healthful community.

The western drainage area, which is described above, includes in its natural-drainage boundaries some of the best residence sections of the city, and the lack of sewerage has been a menace to the health of this portion of the city, and an object of incessant agitation and interest on the part of many citizens of that part of the city. In that section there are school houses, churches, a hospital, and other public buildings which go to make up an important part of the community life.

At the general municipal election in April, 1912, the city of Carthage duly adopted sections 9281 to 9298 inclusive, Revised Statutes 1909, and the result of said election on the proposition to adopt, was duly proclaimed as provided by said section 9281.

Thereafter, on the 11th day of August, 1913, the council passed ordinance No. 102 subdividing the unsewered territory of the city into sewer districts, numbered from 10 to 69, inclusive, there being at the time of the adoption of said laws, nine sewer districts supplied with sewers under the statutes operative prior to said adoption.

After the passage and approval of ordinance No. 102, and on the same date, the council passed ordinance No. 103 providing for and ordering the construction of the trunk sewer here in question, declaring therein that sewer districts numbered 17 to 44 inclusive were deemed to be benefited thereby, except district No. 20, which was found by the council not to be drainable into said trunk sewer, and, therefore, not benefited by the construction thereof. The council, further, by said ordinance No. 103, adopted the plans and specifications for said trunk sewer, and defined the out-boundary lines of said benefit territory, embracing therein sewer districts numbered 17 to 44 inclusive, except district No. 20.

The lands of defendants lie in districts 24, 35, and 44, and range in quantities from 4 to 50 acres, aggregating 138 acres. All said lands lie in the southwest quarter of section 9, township 28, range 31, except the block 40, which lies in the northwest quarter of the northwest quarter of said section 9. It is not disputed that the lands lying within the sewer districts constituting the benefit territory, including the lands of all the appellants, occupy the same drainage. area which this trunk sewer has been designed to serve, and that none of said districts can have any other outlet than through this trunk sewer, except through parallel lines running to Spring River, which is more than a half mile distant from the point on the western boundary of the city, at which all said lines would have to leave the city limits.

The sewer in question is a large trunk sewer commencing at a given point between districts 40 and 42, passing thence through the low grounds in the drainage area to a given point at the western boundary of the city, on the line separating districts 17 and 18, and thence, beyond the city limits, a distance of more than one-half mile to and into Spring River, in which said sewer is to discharge.

This trunk sewer will presently serve by means of district or lateral sewers 3500 to 3600 people, residing in the various districts—more than one-third of the population of the city. Besides, there is included within the territory which said sewer is designed to serve, a hospital and other public buildings herein above mentioned.

The above statement of the case is largely taken from the briefs of counsel for both the plaintiffs and defendant, which are substantially correct.

I. As shown by the statement of the case, the plaintiffs seek to enjoin the construction of the main sewer mentioned therein for the reason, principally, that the ordinance authorizing its construction is unreasonable, unjust and oppressive, in that their lands, used for agricultural and garden purposes, through which a part of the sewer passes, and

Sewer:
Agricultural
Lands.

which will have to bear a large portion of the cost of construction, will not be correspondingly benefited thereby, practically amounting to a confiscation of the same.

This contention of plaintiffs is untenable. The evidence shows that the city of Carthage has a population of approximately ten thousand, and lies on the southern slope of the banks of Spring River, the natural course of drainage—the slope being from south to north; the distance from bluff to the river varies from a few feet to a mile. At the east end of the town the bluff diminishes and disappears, while at the west end it is higher and almost extends to the river.

The natural drainage of the city is divided by natural conditions into three areas, the eastern, central and western; the eastern is made up of a long draw and connecting depressions and tributaries; the central is separated by rising ground from the eastern and western areas, and is much smaller than either of the other two, but includes the business portion of the city; and the western, which embraces practically one-half of the entire area of the city, about 1600 acres, and is tributary to a long draw or depression extending from the southern part of the city in a southwesterly direction to a point outside of the corporate limits.

The eastern and central areas have been properly sewered for drainage and sanitary purposes, but the western area is without sewers, and that portion of the city is dependent almost entirely upon vaults, basins and natural drainage; this has been a constant menace to the health of that portion of the city.

About thirty-five hundred people reside in this area, and there are situate therein schools, churches and the city hospital, and other public buildings.

These conditions clearly show the crying necessity for proper sewerage in that portion of the city.

Opposed to that necessity, the plaintiffs, citizens of Carthage, refer to the large cost of the sewer, about $36 per acre, their large real estate holdings, about one hundred and sixty acres, in the remote parts of said western drainage area, embracing about eight hundred

and twenty-five acres, and contend that on account of the size of those holdings, the small number of residences thereon and the comparatively small benefits they will derive from the sewerage, a great hardship would be worked upon them—amounting to injustice and oppression, if not a confiscation of their property.

That contention must. also be viewed from a different angle from that suggested by counsel for plaintiffs.

In pursuance to the requirements of section 9282, Revised Statutes 1909, the city by ordinance No. 102, divided the unsewered territory of the city into sewer districts, numbered from 10 to 69, inclusive, there being at the time of the adoption of said section, nine sewer districts supplied with sewers under the statutes in force prior to said adoption.

Subsequent to the passage of said ordinance No. 102, the city enacted ordinance No. 103, ordering the construction of the main sewer here in controversy, declaring therein that sewer districts numbered 17 to 44, inclusive, were deemed to be benefited thereby, except No. 20, which the counsel found could not be drained into said sewer or benefited thereby; also adopted plans and specifications for the construction of said sewer, as required by said sections of the statutes.

Plaintiffs' lands lie in districts twenty-four, thirty-five and forty-four, and vary in quantities from four to fifty acres, aggregating according to defendant's evidence, one hundred and thirty-four acres, and that of plaintiffs to one hundred and sixty acres.

It is not denied that the main sewer in question will, by means of district or lateral sewers, drain all of plaintiffs' lands when constructed and connected with it; but the main bone of their contention is that this main sewer will be of no benefit whatever to them until the lateral sewers are constructed and connected therewith, which are not authorized to be constructed by said ordinances, and therefore their lands will be taxed at $36 per acre without any corresponding benefit; it is also contended that even though the lateral sewers were to be constructed, then their construction would cost approxi-

mately $190 in addition per acre, making a total cost of about $225 per acre for the construction of the main and lateral sewers.

For the sake of argument, let us assume these figures to be correct (which is only an assumption, as the lateral sewers have not been ordered constructed, and consequently no plans or specifications therefor have been made, nor have estimates and bids been made of the cost of furnishing the materials and performing the labor necessary for their construction), then it is apparent that from this record there is no present necessity for the lateral sewers and we must presume that the city council will not violate its duty and order their construction in the absence of such necessity; however, should it so do, then and not now, would be the proper time to challenge the reasonableness and validity of an ordinance ordering their construction.

Under the foregoing view of the case we have only to do with the construction of the main sewer in question, the only one ordered constructed. It may for argument's sake be conceded that the plaintiffs' property will not, at the present, receive as great a relative benefit from this sewer as will the other residences in that part of the city; but that is due to the fact that their property is not so densely populated, and consequently that part of their farms and truck patches not used for residence purposes does not need such drainage. But that is not all that is in this case; every person in this State and country holds his property subject to the laws providing for the public health, safety, morals and general welfare, and, if taken or damaged for any one or more of those purposes, then he is entitled to just compensation therefor; likewise, his property must bear its just portion of the cost and expense of securing that protection. Both of those propositions are elementary; and it cannot be disputed that the main sewer in question is of great necessity for the preservation of the public health of the entire western portion of the city; not only that part of it densely populated is benefited, but also that part occupied by the plaintiffs. No one could seriously contend

that the deposit of the refuse of that part of the city into vaults or the discharge of it upon the surface of the ground, so as to find its way to Spring River through or along the natural draws or depressions before mentioned, would be, and, as the evidence shows, is, a continuing menance to the public health, especially to all that part of the city including the plaintiffs. The public health is menaced and endangered by the aggregation of filth and refuse of the entire district, and is not limited to accumulations thereof upon or about each separate lot or tract of ground located therein. We know from the laws of gravity, observation and experience, that garbage and refuse of a city and elsewhere, if not removed and cared for, will seep through the earth and drain down hill to the lower levels, and there become more poisonous, sickly and deathly than upon the higher grounds; this is true for the reason that the rains, snows and seepage will dispose of and carry much of it to the low places; so from a sanitary point of view, the disposition of the sewage of that part of the city lying higher up the slope than the property of the plaintiffs, is of equal benefit, if not greater to plaintiffs, than it is for the people residing above them. The chief purpose of a sewer system is the protection of the public health, and as we have seen, the plaintiffs' property will be equally protected in that regard by the sewer in question; and it is not therefore true, as contended for by counsel, that they are not benefited thereby, or that they are not equally protected with the other residents of that part of the city.

Counsel for plaintiffs seem to think that the benefits to real estate only can be considered in the construction of sewers. While in a technical sense that may be true, but in a practical sense, it is only indirectly true; in a primary sense, the benefits are conferrd upon the entire people of the district, and secondarily upon the real estate, by virtue of its being thereby made more desirable for business and residential purposes, which correspondingly increases the value of the land—presumably equal to the cost of construction, but perhaps not exactly in all cases.

The lateral sewers, as previously shown, will receive the refuse of the upper part of the city, and discharge it into the main sewer, and thereby prevent the same from being discharged into natural and open drains running through or near plaintiff's property, and thereby prevent it from seeping through the ground and otherwise flowing upon plaintiffs' property, which, if not thus prevented, would render their section of the city unsanitary; and in that way the plaintiffs will receive as much or more indirect benefit from said lateral sewers as the densely populated part of the district will from that part of the main sewer which runs through or near plaintiffs' property; and if it is a hardship upon the plaintiffs to have to contribute to the payment of the main sewer before they connect their lateral sewers with it, then they are more than compensated therefor by receiving the benefits of the lateral sewers located above, as previously mentioned. The cost of the construction of the latter, according to plaintiffs' own figures, is far in excess of the cost of the construction of the main sewer; this throws some light upon the relative benefits received by each section of the district. In that way plaintiffs receive the benefits of the main and lateral sewers located above them, without paying one penny therefor, and when they construct their lateral sewers and connect them with the main sewer in question, then the entire district will be completely drained with equal benefits and equal cost; if any difference in cost, it is in favor of the plaintiffs, because they will not be required to construct their part of the lateral sewers until the necessity of that section of the district demands it.

The law does not require all of the lateral sewers of a drainage district to be constructed at the same time; they may be constructed as the necessities therefor may demand. [City of St. Joseph to use of Gibson v. Owen, 110 Mo. 445.]

In fact, the city has no authority to construct them until such necessities do arise; otherwise the ordinance would be unreasonable, unjust and oppressive.

But should it be conceded that the cost and benefits are not exactly equal, that, however, would not invalidate the proceedings or the tax-bills issued in payment of the improvements—this not being an Utopian government, exact equality in taxation cannot be obtained, approximate equality is all the law requires, and in my opinion, that has been accomplished in this case. Especially is that true since that portion of the city situate on the elevation above the property of plaintiffs is thickly populated and is at present in need of lateral sewers, and must, if not already built, be constructed at once, and the burden thereof must be borne by that part of the district only, and not contributed to by the plaintiffs.

II. Counsel for plaintiffs also raise the question as to whether or not the extension of the city limits embracing their lands was illegal on account of lack of notice of the election held to extend the limits.

The evidence upon this question is not sufficient to justify the court in giving it serious consideration; besides that, the contention seems to be too stale to justify consideration, fifteen years having elapsed since the extension was made.

In the case of State ex rel. v. Westport, 116 Mo. 582, where the delay had been only twelve years, this court refused to consider the question in a direct proceeding by *quo warranto,* holding the parties had slept too long on their rights, if any they had, and were therefore estopped.

The case of State v. Leatherman, 38 Ark. 81, is to the same effect.

In Perkins v. Fielding, 119 Mo. 149, this court held that the validity of an ordinance could not be collaterally attacked on the ground the council was not legally constituted.

There is no merit in this contention.

There are other minor questions presented, but they do not affect a proper disposition of the case.

For the reasons stated, the judgment of the circuit court is affirmed. All concur, *Bond, P. J.,* in result.