C. D. GRAVES, ASA SHARP and CHARLES PEBLEY v. LITTLE TARKIO
    DRAINAGE DISTRICT No. 1, a Corporation, and JOHN PFLAUMER,
    JOHN SPEER, RANSOM BROWNING, LUTHER NORMAN, Members of
    and Supervisors of LITTLE TARKIO DRAINAGE DISTRICT No. 1,
    and JOHN SPEER, Secretary-Treasurer of said LITTLE TARKIO
    DRAINAGE DISTRICT, Appellants.—134 S. W. (2d) 70.

Division One, December 13, 1939.

558

*Gore & Gore* and *Watson, Ess, Groner, Barnett & Whittaker* for appellants.

560

*DuBois & Miller* and *Livengood & Weightman* for respondents.

DALTON, C.—This is a proceeding in equity against The Little Tarkio Drainage District No. 1 (hereinafter referred to as the District), its officers, the county collector, and certain warrant holders (1) to declare said warrants, as a class, as issued by the drainage district, to be null and void; (2) to restrain defendants from levying any future taxes to pay said warrants; and (3) to enjoin the collection of part of the 1938 maintenance tax as levied by the district. The plaintiffs were three landowners and taxpayers of the district. Three warrant holders were made defendants on the theory that they represented all warrant holders, as a class, in this litigation. From an adverse judgment the district and its officers have appealed.

Respondents' position is that the improvements for which the warrants were issued were not within the original plan of reclamation of the district, or any amendment thereof; that there were no funds

in the hands of the district to pay for the particular improvements when started or while under construction; that the warrants issued therefor, and protested, were without authority of law; that the district officers planned to pay illegally the said warrants out of future annual maintenance levies; and that maintenance taxes in excess of $10,000 had been levied for 1938, while current maintenance and expenses did not exceed $500. Appellants' answer admitted that the system of drainage as constructed and in existence prior to the issuance of the warrants was not in accordance with the original plan for said district; but alleged that the system, as it existed, had been constructed with the full knowledge of plaintiffs, without objection; and that the then existing plan of reclamation had been in existence many years. The answer then pleaded laches and estoppel against plaintiffs by reason of said facts and the lapse of time since the changes were made, and set up the further fact that plaintiffs had voluntarily accepted the benefits of the improvements with full knowledge of all facts.

There is little dispute as to the facts in this case. The district was organized by the Circuit Court of Holt County, June 1, 1909, for the purpose of reclaiming about 5600 acres of land in said county. The total amount of all benefits originally assessed against all lands in the district was $102,922.70. In 1910 approximately $55,000 was spent for original construction. In 1916, $27,500 additional was spent for completion and improvements. In 1923 approximately $16,500 was spent "to clean out, straighten and widen the ditches and drains in said district and to construct and maintain main and lateral ditches, levees and dikes and other works . . . deemed necessary." In November, 1936, the balance of approximately $4000 (being the net excess of assessed benefits over and above the total of all taxes previously levied for improvements) was levied and spent by the district.

The original plan for reclamation provided for a main ditch approximately five miles in length, with a bottom width of twenty-four feet, a top width of thirty-six feet, and of such depth as to secure uniform grade. The main ditch, ten to sixteen feet in depth, extended southeastwardly from a point in Little Tarkio Creek on the north, to Big Tarkio River on the south.

The plan of drainage provided that the waters carried by this ditch be divided at the point where said ditch intersected the Craig Ditch; that part of the water go down the Craig Ditch, and part on down the new ditch; each to be capable of carrying an "equal" volume. Both ditches had the same outlet, to-wit, Big Tarkio. The fall of the main ditch, above the Craig Ditch, was 5.28 feet per mile, and below the intersection, 3.17 feet per mile. The main ditch was designed to carry ordinary high water within its cut banks, and extraordinary floods were to be taken care of within the ditch levees. The size, height and location of the levees on each side of the main ditch were not

fixed in the original plan, and no estimate of the cost of such levees was included. A right-of-way of not less than 100 feet was recommended for the main ditch. The total estimated cost of the original plan of drainage was $55,375.

The District was reorganized August 31, 1936, for an additional period of twenty years, but no amended plan for reclamation was ever adopted by the District, or submitted to or voted upon by the landowners, and there has been no additional assessment of benefits.

As actually constructed in 1910 the main ditch was of varying depth but twenty-four feet wide at the bottom and thirty-six feet wide at the top. Levees were constructed on each side with a two to one slope and were located where the dirt happened to be dumped out. The levees were of no definite height, but varied from five to eight feet. They were set back at least ten feet from the edge of the main ditch. Where the levees were five feet in height their tops were about seventy-six feet apart.

By 1917 the Craig Ditch, which under the original plan was to divert and carry off one-half of the water carried by the main ditch at the point of intersection, had become filled and was totally useless on account of lack of a sufficient outlet. The Craig Ditch extended through the lands of plaintiffs Graves and Sharp. It had no levees and frequently flooded. In November, 1917, the board of supervisors, of which plaintiff Graves was then a member and secretary, made an order that the Craig Ditch be completely filled up at its intersection with the main ditch. The gaps in the levees were closed on both sides of the main ditch and never re-opened. Wing levees were built to direct water to the main ditch. The channel of a drain known as Gaskill Branch was cut into the main ditch. Thereafter the landowners on each side of the main ditch, and below the Craig Ditch intersection, built higher levees on each side of the main ditch to shut out the excess water being carried by the said ditch. This work was done with funds raised by voluntary assessment. In 1923 plaintiffs, Sharp and Graves, as members of the board of supervisors of the district, joined in directing the expenditure of the funds for completing improvements, cleaning out and widening ditches, and constructing lateral ditches, levees and improvements deemed necessary to preserve and maintain works in the district.

As originally constructed, and as thereafter enlarged, the main ditch and its levees were entirely inadequate to meet the needs of the district, and especially so, after 1926 when Little Tarkio, at points above the district, was straightened so as to speed the discharge of flood waters into the district. The levees on the main ditch broke frequently. These breaks, and resulting overflows, resulted in surface-level changes in the district. Landowners from time to time attempted to close breaks in the levees, and built levees, some of which washed away. Although the original right-of-way for the main

ditch was 100 feet, more was used when the ditch and its levees were constructed. In 1917 the main ditch was cleaned out and the dirt dumped outside until 140 to 150 feet of right-of-way was used. Other changes were made by the improvements of 1923.

In the original plan only three specific lateral ditches, with twenty foot right-of-ways, were recommended and described, but between 1910 and 1936 four new and additional laterals were put in by landowners, so that a total of seven laterals were in existence.

In 1936 the drainage system was generally out of repair. Some of the levees built with funds from voluntary assessments and some built by the district had totally washed away. There were nine breaks in the main levees; seven on the east side, and two on the west. Some lands in the district were continuously under water. In the election of officers in 1936 a slate was elected favoring restoration of the drainage system. Plaintiffs participated in the election, opposing persons favoring restoration, and lost. The new board promptly adopted a plan whereby levees were to be constructed on each side of the main ditch, approximately 250 feet apart, with an average height of twelve to twenty-two feet (allowing 20 per cent for shrinkage). The levees were to be ten feet wide at the top, and to be built to a grade line at the top, so as to have a fall of two feet per mile. The plan was designed to increase the capacity of the main ditch and its levees so as to take care of such a flood as occurred in 1929. The 1929 flood brought 12,000 cubic feet of water per second into the district, or more than three times the then carrying capacity of the main ditch.

In October, 1936, the board entered into a contract with one Petersen for the purpose of carrying out the proposed improvements, and agreed to pay him at the rate of five and one-half cents per cubic yard for each yard of earth excavated or handled. Petersen was to be paid on estimates issued monthly as the work progressed, and when the tax funds were exhausted the contractor was to accept warrants of the district, said warrants to be protested and to bear six per cent. interest. The work began in 1936 and extended through 1937 when it was completed.

In building the new levees the dirt was taken from the inside so that the size of the main ditch was greatly widened and no berms were left on either side. The remaining portions of the old levees were relocated and merged in the new ones. When the new levees were finished, the main ditch was approximately 220 feet in width, extending between the two levees. The main ditch and levees now occupied approximately 300 feet of right-of-way. The evidence disclosed Big Tarkio was still the only outlet for all waters from the district, but there was evidence that it had filled in greatly, and did not now provide a suitable outlet; that, therefore, the water from the main ditch overflowed into a big swamp or settling basin, a "no-man's

land" some four miles back from the Missouri River; and that there was much filling in at the lower end of the main ditch.

In April, 1937, while these improvements were in progress, the board extended the work to furnish certain local drainage to district lands standing under water, and a total of $1067 was thereafter spent in cleaning out existing laterals and extending others. Seventy-five per cent of the $1067 was spent for cleaning out existing laterals, and twenty-five per cent for new laterals or extensions to existing laterals. The evidence is conflicting as to whether lateral seven was in existence or wholly new, however, it extended only 200 feet. Plaintiffs Sharp and Graves were present frequently as the work on the main ditch and levees progressed. Plaintiff Sharp asked for the rebuilding of a levee on his farm and this was done. Plaintiff Graves received a new ditch on his land where he had previously cut a small one. There was evidence that they were closely in touch with the work as it progressed.

At the time the 1936 contract was let the district had available for payment on improvements the $4000 levied against the balance of assessed benefits, and a maintenance tax assessment of $2573 (2½ per cent of the total assessed benefits of the district). These amounts, together with a ten per cent maintenance tax ($10,297.29) levied and collected in 1937, were paid out on the new work. In 1938 the board levied a further ten per cent maintenance tax in the sum of $10,297.29. The board expected to use these funds for the payment of current expenses, and the balance for the payment of the outstanding and unpaid warrants originally issued to Petersen. Some of this 1938 assessment had been collected prior to the institution of this suit. At the time suit was instituted (on September 24, 1938) the district had on hands $1663.86 in the maintenance fund, and $3388.84 in the sinking fund. It owed $4500 on the original bond issue, and of the $43,482.49 in warrants issued to Petersen in 1937 and 1938, a balance of $39,054.49 remained outstanding and unpaid. The actual amount of maintenance work done in the district in 1938, and prior to the institution of the suit amounted to less than $500.

The trial court found that, though the original plan of reclamation was inadequate, the work of Petersen could "under no possible view" be considered maintenance, restoration, repair or strengthening of the original system; that the district had no authority or means to pay for the character of work performed by Petersen; that the indebtedness created therefore and the warrants issued were illegal and void; that the 1938 ten per cent maintenance levy was not needed for current expenses and maintenance for that year, and that a levy in excess of $500 for 1938 was without authority of law.

Respondents contend that the board of supervisors acted without authority in contracting with Petersen and in issuing warrants for work completed; that the original plan of reclamation has not been

amended as provided by Section 10769, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10769, p. 3498) or by Section 10793, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10793, p. 3520), and, therefore, that it has not been amended; that the improvements constructed by Petersen were not maintenance, repair, reconstruction or preservation of the plan of reclamation of the district, but constituted the construction of a new drainage system; that the warrants issued therefor in 1937 cannot be paid from the 1938 or subsequent maintenance taxes, since said warrants do not represent maintenance or current expenses for said subsequent year or years; that the ten per cent maintenance tax is limited to ten per cent of the original (1910) construction costs; that all tax levies, including maintenance tax as assessed from year to year, may not exceed the total net assessed benefits; and that the provisions of Section 11024 et seq., Revised Statutes 1929 (Mo. Stat. Ann., sec. 11024 et seq., p. 3663 et seq.) provide an exclusive method for the issuance of tax anticipation warrants.

■ A drainage district is a public corporation. [Sec. 10745, R. S. 1929 (Mo. Stat. Ann., sec. 10745, p. 3472).] A district is not a municipal corporation in the restricted sense of the term. Its purpose is to exercise governmental functions. [State ex rel. v. Allen, 298 Mo. 448, 456, 250 S. W. 905, 906; State ex rel. v. District, 291 Mo. 72, 79, 236 S. W. 15.] The drainage district law is a code unto itself, and the courts must follow the provisions of the statutes governing such districts. [State ex rel. Scott v. Trimble, 308 Mo. 123, 134, 272 S. W. 66, 68; In re Mississippi & Fox River Drainage District v. Ackley, 270 Mo. 157, 173, 192 S. W. 727.]

■ All the terms and provisions of the drainage act should be "construed broadly and liberally to effectuate the wholesome and beneficial motives which prompted its enactment." [In re Big Lake Drainage District v. Rolwing, 269 Mo. 161, 171, 190 S. W. 261, 264; Wilson v. Drainage District, 257 Mo. 266, 289, 165 S. W. 734, 740.] Section 10808, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10808, p. 3530) expressly provide that: "This article is hereby declared to be remedial in character and purpose, and shall be liberally construed by the courts in carrying out this legislative intent and purpose." In determining whether or not the board of supervisors could legally enter into the said contract with Petersen, we must first consider the express powers conferred by the statutes. Section 10758, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10758, p. 3486) provides: "The board of supervisors of said district shall have full power and authority to build, construct, excavate and complete all and any works and improvements which may be needed to carry out, *maintain and protect 'the plan for reclamation.'* " Section 10768, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10768, p. 3496) provides: "In order to effect the drainage, protection and reclamation of the land and other property in the district subject to tax the board of supervisors is

authorized and empowered to clean out, straighten, widen, change the course and flow, alter or deepen any ditch, drain, river, watercourse, . . . or natural stream in or out of said district; . . . and to concentrate, divert or divide the flow of water in or out of said district; to construct and maintain main and lateral ditches, canals, levees, . . . *and any other works and improvements deemed necessary to preserve and maintain the works in or out of said district; . . .*

Section 10789, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10789, p. 3517) provides: "To *maintain* and *preserve* the ditches, drains, levees or other improvements made pursuant to this article and to *strengthen, repair* and *restore* the same, *when needed,* and for the purpose of defraying the *current expenses* of the district, the board of supervisors may upon the completion of said improvements and ôn or before the first day of September in each year thereafter, levy a tax upon each tract or parcel of land and upon corporate property within the district, to be known as a 'maintenance tax.' Said maintenance tax shall be *apportioned upon the basis of the net assessments of benefits accruing for* original construction, *shall not exceed ten per cent thereof in any one year* . . ."

Respondents contend these sections have no application for the reason that the improvements contemplated in the contract with Petersen called "for the construction of a new drainage system;" that the greatly increased size of the main ditch (dirt having been taken from the ditch for the building of the new levees) ; the relocation and increased size and height of the new levees as compared with those first constructed; the increased width of the right-of-way occupied, as compared with the amount originally recommended; the addition and extension of laterals; and the closing of the Craig Ditch, so that all waters continued down the main ditch, constituted "a new plan of reclamation" that had not been submitted to, voted upon, or adopted by the landowners of the district as an amended plan of reclamation. Appellants' position is that respondents may not complain of any changes in the plan of reclamation made prior to 1936 on account of long acquiesence in such changes.

We have seen that the original plan provided for the construction of one main ditch with laterals and for levees on each side of the main ditch to carry extraordinary flood waters. The size, height and location of the proposed levees on each side of the main ditch were not fixed by the "plan of reclamation," but they were intended to carry extraordinary flood waters through the district. The plan provided for the waters of Little Tarkio Creek to be carried to Big Tarkio, but with part diverted by way of the Craig Ditch. The Craig Ditch with no levees overflowed, filled in and became wholly useless as an outlet. It was completely closed by action of the Board in 1917 and remained closed thereafter. There is no suggestion that it could or

should be opened. The main ditch was widened, new and higher levees were built, repaired, and relocated; new and additional laterals were established; Little Tarkio above the district was straightened; and the flood waters coming into the district were greatly increased; some lands in the district filled in and others washed out. In its essential features the plan of reclamation was not changed, but insofar as it was amended or changed, those changes were confirmed by long acquiesence in the changed conditions. In so far as the plan of drainage in existence in said district in 1936 differed from the original plan of 1909, there had been a *de facto* amendment which was recognized by the public, the landowners, and interested parties who had long since adapted themselves to the changed conditions. We hold that the plaintiffs by laches have lost the right to complain that the plan of reclamation was not in fact amended prior to 1936. It would be inequitable to now hold otherwise. The doctrine of laches is an equitable doctrine. It is particularly applicable here.

In the case of State ex rel. v. Town of Westport, 116 Mo. 582, 22 S. W. 888, a lapse of twelve years was held sufficient to estop the State, on the ground of laches, from depriving a city of its franchise because of irregularity in its organization.

In the case of Stamper v. Roberts, 90 Mo. 683, 3 S. W. 214, plaintiff, a landowner in an irregularly established school district, sought to enjoin the collection of taxes on the ground that the district was never legally organized. The suit was commenced after the district had existed as a *de facto* district for four years. It was held that plaintiff by his laches had allowed a condition of things to exist for four years which would make it inequitable to grant such relief.

In the case of Kircher v. Evers (Mo. App.), 247 S. W. 251, plaintiff sued to enjoin the payment of a warrant on account of alleged irregularity in the removal of a school house site. It was held that laches by acquiesence for six and a half years prevented the remedy sought. [See also State ex inf. Otto ex rel. Harrington v. School District, 314 Mo. 315, 328-332, 284 S. W. 135, 139-140; State ex inf. Shartel ex rel. City of Sikeston v. Missouri Utilities Co., 331 Mo. Mo. 337, 53 S. W. (2d) 394; City of Mountain View v. Farmer's Telephone Exchange, 294 Mo. 623, 243 S. W. 1531; Whitsett v. City of Carthage, 270 Mo. 269, 286, 193 S. W. 21, 25.]

The board of supervisors as elected in 1936 could therefore exercise all powers granted to them by the foregoing statutes and deal with the plan of reclamation of said district as then in existence. The condition of the district presented a serious situation. The plan of reclamation was not functioning. The levees were broken in many places; some ditches were filled in until hardly recognizable as a depression. The increased floods from above were rapidly destroying the works of the district. The new board was faced with the duty of protecting and preserving the investments of the district in ditches

and levees. It arrived at a plan for maintaining, preserving, repairing and restoring the works of the district so that the entire system would again be operative and function for its intended purpose. In determining whether or not the board had authority to put said plan into execution requires a construction and application of the statutes heretofore referred to. "It is an elementary and cardinal rule of construction that effect must be given, if possible, to every word, clause, sentence, paragraph, and section of a statute, and a statute should be so construed that effect may be given to all of its provisions, so that no part, or section will be inoperative, superfluous, contradictory, or conflicting, and so that one section, or part, will not destroy another. [Sutherland on Statutory Construction (2 Ed.), 731, 732, sec. 380.] Moreover, it is presumed that the Legislature intended every part and section of such a statute, or law, to have effect and to be operative, and did not intend any part or section of such statute to be without meaning or 'effect.'" [State ex rel. Dean v. Daues, 321 Mo. 1126, 1151, 14 S. W. (2d) 990, 1002.] We have seen that the board had the power to *deepen, widen,* and *alter any* ditch and to *construct main* and *lateral ditches,* drains, *and levees* "and any other works and improvements deemed necessary to preserve and maintain the works in or out of the district." We hold that the reconstruction of the main ditch, levees, and laterals covered by the contract with Petersen was within the powers granted to the board of supervisors to maintain and protect "the plan for reclamation." [State ex rel. McWilliams v. Bates, 235 Mo. 262, 290-293, 138 S. W. 482, 489-490; Wilson v. Drainage District, 257 Mo. 266, 287, 165 S. W. 734, 740.] The authority granted necessarily implies the right to incur the liability to pay for the work. There is no suggestion that the board did not act in absolute good faith and in accordance with its best judgment, and this suit was not instituted until long after the improvements were finally completed and after the restored plan of reclamation was again operating.

Respondents contend that the board should have proceeded under either Section 10769, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10769, p. 3498) or Section 10793, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10793, p. 3520). The first section provides that if the adopted plan of reclamation proves to be discriminatory and fails to equally protect lands equally taxed that the board may amend the plan of reclamation and provide for enlarging or adding ditches and other improvements and that after the amendment the new improvements may be paid for out of the benefits assessed against all lands in the district in the same manner as improvements provided by the original plan. Under this section a tax against assessed benefits, levied for improving and constructing additional ditches to afford to each tract of land in the district equal drainage and protection from overflow, which tax did not exceed benefits assessed, was

held valid as to lands benefited by original reclamation work and not further benefited by the additional work. [Rauch v. Himmelberger, 305 Mo. 70, 264 S. W. 658.] The section, however, has no application here, since it is not contended that the original plan of reclamation was discriminatory or that the proposed improvements were to be paid for out of direct levies against assessed benefits.

Section 10793, referred to, applies when the plan of reclamation is found insufficient and the board desires to secure an additional assessment of benefits against lands in the district to pay for new improvements, or to be available for that purpose if needed. Said section provides that, ''the board of supervisors shall have the right to formulate new or amended plans . . . and additional assessments may be made . . .'' In this case there was no attempt to secure an additional assessment of benefits against lands in the district by reason of the proposed improvements and the board was not required to proceed under said section. There was no evidence as to what additional benefits, if any, which could be assessed against lands in the district, would result from the reconstruction of the ditch. The main ditch (now enlarged) was intended for the same general purpose for which it was originally constructed. If the board was required to proceed under Sections 10769 or 10793, under the circumstances of this case, then Sections 10758 and 10768 would serve no purpose. It is out duty, however, to harmonize and reconcile and give effect to each and every part of these statutes.

Respondents further contend that since the outstanding warrants represent indebtedness incurred in 1937, over and above the income and revenue of said year, that they cannot be paid from 1938 maintenance or current expenses. In this connection it is important to notice that the maintenance tax has other purposes than maintenance. The statute providing that it is ''to be known as a 'maintenance tax.' ''.

We find no particular provision of the statutes limiting the amount of indebtedness a district may incur in any one year to preserve and maintain or to repair and restore the works of the district. There is no specific provision limiting such indebtedness in any one year to the amount which the district may levy and collect as maintenance tax in said year. There is no provision which prohibits the application of funds derived from maintenance taxes during any one year, to the payment of maintenance expenses incurred during the previous or preceding years, nor to the carrying over of surplus funds for use for maintenance in subsequent years. No reason has been suggested why this court should hold that a drainage district may not become indebted in any one year in excess of income and revenue provided for that year, if such indebtedness is necessary to preserve and maintain the plan of drainage.

In the case of State ex rel. McWilliams v. Bates, 235 Mo. 262, 295, 138 S. W. 482, 490, a case dealing with levee warrants, this court

said: "The law making county warrants receivable for county taxes (Sec. 3800, R. S. 1909) provides that county warrants can only be received for taxes of the year during which such warrants are drawn; and this works out satisfactorily, because county warrants cannot be legally issued in excess of the county revenue for each year. However, no such rule applies to the issue of warrants for building levees and excavating ditches. When once a levee or ditch is begun, it must, to become effective, be completed with all convenient speed; and this will often result in the issue in one year of enough, or more than enough warrants, to consume the tax levies of four years. This gives parties who own lands in the district an opportunity to collect their warrants promptly, by using such warrants in payment of their taxes; but leaves other warrant-holders who do not owe such taxes to wait an unreasonable time for their money."

The fact that drainage districts have been required to build and maintain bridges where their ditches cross public highways, whether such cost was provided for in their original plans, or not, would also indicate that the district is not without authority to incur indebtedness in excess of maximum annual maintenance income. These duties and obligations are not based on assets or income. [State ex rel. Chamberlin v. Drainage District, 311 Mo. 309, 326, 331, 278 S. W. 388, 393, 395; State ex rel. Ashby v. Medicine Creek Drainage District, 284 Mo. 636, 654, 224 S. W. 343, 346.] The same is true of County Court Drainage Districts. [Camden Special Road District v. Willow Drainage District (Mo. App.), 199 S. W. 716; Cunningham Realty Co. v. Drainage District No. 6, 226 Mo. App. 1, 22, 40 S. W. (2d) 1086, 1097.]

The mere fact that the current expenses of the district and the amount spent for current maintenance, prior to September 1st of any year, does not equal the amount of the maintenance tax, proposed to be collected that year, is not a limitation upon the power of the board to levy and collect said tax under Section 10789. The amount of the tax is limited to ten per cent of the net assessment of benefits *accruing for* original construction and the tax is required to be apportioned upon the basis of benefits assessed. It was therefore immaterial as to what amount was spent in 1910 for original construction, since the entire amount of assessed benefits accrued for and were available for such purposes, and all assessed benefits have now been applied to such purposes. The wording of Section 10844, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10844, p. 3560) applying to County Court drainage districts is very different. The board could therefore properly levy a ten per cent maintenance tax in 1938 in the sum of $10,292.27, and apply the proceeds thereof to current expenses and current maintenance for 1938, with any excess on the 1937 maintenance indebtedness. It is immaterial to any issues in this case that

572

the incurred and prospective current expenses and maintenance for the year 1938 did not exceed $500.

Respondents further contend that since all of the assessed benefits of the district have been exhausted, that any maintenance tax is within the limiting provisions of said Section 10793 providing that, "the total of all levies of such tax shall not exceed the total amount of benefits assessed." We are of the opinion that said section has no application to maintenance taxes, but refers to levies of taxes against assessed benefits as provided for under Section 10759, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10759, p. 3486), and additional assessed benefits under Section 10793. A reference to other sections of the act leads to the same conclusion.

Section 10757, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10757, p. 3484) provides that if "the estimated cost of constructing the improvement contemplated in 'the plan for reclamation' is less than the benefits assessed against the land and other property in the district" the court shall approve the commissioner's report. Other sections show that the whole amount of assessed benefits may be levied and spent for original construction, and that interest accruing on bonds shall not be considered in determining whether or not the expenses and costs of making the improvements equal the benefits assessed. Section 10789, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10789, p. 3517) provides for the levy of a maintenance tax upon the completion of the improvement and "in each year thereafter" and provides that the tax "shall not exceed ten per cent . . . (of assessed benefits) in any one year." There is no limitation upon the total amount that may be assessed for maintenance, preservation, restoration, and repair over a period of years. If respondents' contention were correct, no drainage district could maintain its system, because the excess of benefits assessed over the amount levied for construction costs would soon be exhausted and there could be no maintenance tax. No such intent appears from the statutes. We hold that the act provides for a continuing power to assess "maintenance taxes." [Houck v. Drainage District, 248 Mo. 373, 382-387, 154 S. W. 739, 740, 742.]

Respondents finally contend that the provisions of Article X, Chapter 64, Section 11024 et seq., Revised Statutes 1929 (Mo. Stat. Ann., sec. 11024 et seq., p. 3663 et seq.), provide an exclusive method by which indebtedness may be incurred and tax anticipation warrants may be issued, and that said sections were not complied with. These sections were passed in 1929 (Laws 1929, p. 190, secs. 1-7) and limit in amount and in time of maturity warrants which may be issued thereunder and expressly require the assent of the owners of two-third the acreage of the district. A review of said new sections discloses that they cover some rights previously enjoyed by districts and add other new and different rights, but there is nothing to

indicate an intention that said sections should thereafter provide the exclusive method for issuance of warrants by drainage districts. Said sections gave new and additional powers but did not necessarily take away rights then possessed by the district. Districts had the power to issue warrants for indebtedness, Section 10775, Revised Statutes 1929 (Mo. Stat. Ann., sec. 10775, p. 3503), but did not have the power to *sell* warrants in order to buy machinery, drag lines and equipment and then to pay the said warrants out of the maintenance fund. The district did not attempt to proceed under said sections and could not since the amount of such warrants, as provided for by said sections, together with interest, was limited to "two and one-half per cent of the assessed benefits for any years falling due." In this case it is admitted that the outstanding warrants in controversy, in the sum of $39,054.49 are in excess of all benefits assessed, and were issued after all assessed benefits were exhausted by levies against the same, and after all maintenance income for 1937 was exhausted, and that there is no fund out of which they could be paid, except future maintenance levies.

Since Article X, Chapter 64, Revised Statutes 1929, was an amendment to the then drainage law we think the rule of construction announced in the case of State ex rel. Dean v. Daues, 321 Mo. 1126, 1152, 14 S. W. (2d) 990, 1002 applies: "Moreover, in the construction of amendments to a statute, the legislative body, in enacting the amendment, will be presumed to have had in mind all existing, unamended and unchanged provisions and sections of the statute, and to have had in mind, also, the judicial construction given to such existing, unamended and unchanged provisions and sections of the statute by the highest court of the state. [25 R. C. L. 1067.]"

We are also of the opinion that said sections did not result in an implied repeal of prior statutes authorizing the issuance of warrants. "Repeals by implication are not favored—in order for a later statute to operate as a repeal by implication of an earlier one, there must be such manifest and total repugnance that the two cannot stand; where two acts are seemingly repugnant, they must, if possible, be so construed that the latter may not operate as a repeal of the earlier one by implication; if they are not irreconcilably inconsistent, both must stand. These principles of construction are well settled." [State ex rel. Peck v. Brown, 340 Mo. 1189, 1193, 105 S. W. (2d) 909, 911.] We therefore hold that since the district had the right to incur indebtedness for the purposes set out in Sections 10758 and 10768 and to issue warrants (Sec. 10775) that those powers already possessed were not limited by the addition of Section 11024 et seq. which granted new and additional powers. The said warrants are therefore valid outstanding obligations of the district and may be paid out of future levies of maintenance taxes.

The cause is reversed and remanded with directions to dismiss respondents' petition and enter judgment for appellants. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.