THE CITY OF HARDIN, MISSOURI, a Municipality of the Fourth Class, W. G. FERGUSON, JOHN SUMMERS ET AL., Appellants, v. The NORBORNE LAND DRAINAGE DISTRICT OF CARROLL COUNTY, MISSOURI, a Public Corporation, WALTER MOENTMANN, J. N. BRYAN, HENRY LOEVAN, KENTON SUMMERS and WILLIAM WEGENG, Members of the Board of Supervisors of Said Defendant District, and MARION FORD, Contractor, Respondents, No. 41524—232 S. W. (2d) 921.

Division Two, September 11, 1950.

Motion for Rehearing or to Transfer to Banc Overruled, October 9, 1950.

*Harry A. Hall* and *Wilson D. Hill* for appellants.

*W. A. Franken, John Franken, Francis G. Hale* and *Robert E. Coleberd* for respondents.

1114

ELLISON, P. J.—The plaintiff city of Hardin and a large number of landowners appeal from a judgment of the Ray county circuit court denying their petition to enjoin the defendant-respondent Norborne Land Drainage District of Carroll county, its supervisors and contractor, from constructing and maintaining what we shall call for convenience a "new levee of greater height alongside an existing levee in the district. Respondents say it is merely an extension of the original levee. Appellants assert the new levee would block the natural drainage of overflow water and cause it to inundate their publicly and privately owned realty, none of which is in the district, to a depth of five feet, and would damage the same in excess of $1,000,000, without just compensation, in violation of Sec's 10 and 26, Const. Mo. 1945.

Appellants further contend: (1) that Art. 1, Chap. 79, R. S. 1939, Mo. R. S. A., Sec's 12324-12389 A, under which respondent district was reorganized in 1917, require the new levee to be sanctioned by its plan for reclamation; (2) that it is neither sanctioned nor contemplated by that plan; (3) that in 1944 in a proceeding in the Carroll county circuit court the district sought to have its plan for reclamation amended so as to permit the construction of the new levee, and such permission was refused, thereby making the matter res judicata; (4) that the district has no right to dam and collect the flood waters from the Missouri and Crooked rivers by means of the levee, and force them in destructive quantities on appellants' lands; (5) and that injunction is the proper remedy to prevent it.

The respondent district and co-appellants maintain: (1) that they have the right to construct the new levee under the statutes above cited; (2) that the new levee is merely a lateral extension of the existing levee and will be built to protect the land in the district in furtherance of ▇▇▇▇ the intent and purpose of the existing plan for reclamation; (3) that the denial by the Carroll county court in 1944 of the respondent district's petition for a change in the plan for reclamation was not res judicata of its right to construct the new levee as a part of the old; (4) that the district has already acquired by condemnation the land upon which the new levee is to be built, that condemnation proceeding being entirely different from the Carroll county drainage district proceedings, in consequence of which there was no adjudication common to both, and no res judicata between the two; (5) that the raising of the elevation of the levee system will not interfere with any natural watercourse; (6) and that the denial of the injunction was proper because appellants' lands are outside district and they therefore have no legal interest in the building of the levee.

The facts, stated as briefly as possible, are that the respondent drainage district contains 40,000 acres in the southeast part of Ray county and the southwest part of Carroll county. In 1924 it built, and has since maintained, a levee in accordance with its plan for reclamation, as approved by the circuit court of Carroll county. That levee runs south and east of the city of Hardin, and its elevation is about 2-½ feet below that of the city. Hence it did not cause overflow there under the conditions existing in former years. The top of the levee is graveled and used as a public road for about 1-¼ miles. The new levee involved here parallels and abuts the existing levee. It is admitted that its elevation will be about 5-½ feet above that of the old levee. One of appellants' witnesses said it would be 9 feet higher. And it is concededly higher than is provided in the district's plan for reclamation. This additional height could not be superimposed on the existing levee without destroying the graveled road therealong. As shown by appellants' photographs, Exhibits 7, 8 and 9, a part of the new levee had been built before this case was tried.

The sources of the flood water are Crooked river and the Missouri river. The former comes from the northwest and loops around the south side of the city of Hardin, within ½ mile thereof at the nearest point. Thence it swings in a southerly direction and discharges into the Missouri river about four miles south of Hardin. There is a rather extensive flood area of low farm land southeast of the city. Three other levee or drainage districts have coverage and levees there. These exclude flood water from the protected parts, but reduce the area of the unprotected part and raise its flood water level. It appears also that a navigation levee has been built along the Missouri river, having the same effect. In the 1943 flood the respondent dis-

trict and 800 soldiers placed sandbags on the Missouri river levee.
In 1946 one of the other levee districts raised its levee, and the next
year high water overflowed the respondent district's original levee
and submerged 20,000 acres of farm land therein.

The respondent district thereupon, that same year, filed a condem-
nation suit in the circuit court of Ray county to appropriate strips
of land for the new levee. The old levee abuts the boundary line of
the district and the new levee is built against the old one. In other
words, both levees border on but are just outside the district bound-
ary. This condemnation suit was resisted by two of the servient
landowners, who applied to this court for a writ of prohibition, which
was denied without opinion.

The district then proceeded with its condemnation suit, paid the
damages assessed, took possession of the condemned strips, and re-
sumed construction of the new levee. They were ejected from the
land by the landowners, and the district then brought a suit in the
circuit court of Ray county to enjoin the landowners from obstructing
the construction of the new levee. That court issued its restraining
order and the landowners brought prohibition in the Kansas City
Court of Appeals. After a hearing on the merits that court quashed
its preliminary writ and denied relief. State ex rel. Stratton et al.
v. Maughmer, Judge, et al., 214 SW. (2d) 754. Accordingly, the
drainage district resumed construction of the new levee, but the city
of Hardin and associated landowners brought the instant suit
against the district, its supervisors and contractor, in November, 1948
to enjoin the construction of the levee.

 Appellants' basic contentions are that the construction of the
new levee is not authorized or contemplated by the respondent dis-
trict's old 1924 plan for reclamation; that the circuit court drainage
act, cited at the beginning of this opinion, specifies the only method
of changing the district levee scheme; that the district has not fol-
lowed that procedure, but is attempting to construct the new levee
under the old plan for reclamation: in consequence its action is and
will be ultra vires.

In so contending appellants quote the statement found in many
decisions of our appellate courts, that the Drainage Act cited at the
beginning of this opinion is "a code within itself"—a fact which no
one disputes. They also cite Sec. 12349 thereof, which enumerates the
broad powers of the board of supervisors, but says nothing about a
change in plan; and Sec. 12367, which specifies the procedure by which
the board may petition for a decree of the circuit court authorizing
a change in the plan for reclamation, after a hearing of which public
notice must be given, and at which the landowners may appear and
object. No such proceeding was had here.

But these are not the only sections of the Act applicable to the
present controversy. Respondents cite Sec. 12339 which provides that

the board of supervisors "shall have full power and authority to build, construct, excavate and complete all or any works and improvements which may be needed to carry out, *maintain and protect* 'the plan for reclamation.'" Likewise, Sec. 12349 [also cited by appellants, supra] authorizes the board to "concentrate, divert or divide the flow of water in or out of (the) district," and to construct and maintain main and lateral levees; and to condemn for the use of the district land or property within or without the district.

Still further, Sec. 12350 provides that after the plan for reclamation has been filed in the office of the circuit clerk, and work has progressed thereunder, if it be found that some of the ditches or other improvements called for by the plan are inadequate, and do not afford substantially equal protection to all the land in the district equally taxed, the board on recommendation of the chief engineer may enlarge the inadequate ditches, construct such additional levees as are necessary; and file a description of the added improvements with the secretary of the board and a certified copy with the circuit clerk, whereupon it shall become a part of the plan for reclamation. The section does not require any court action. But the cost of the added works is paid out of *benefit assessments.*

Sec. 12370 provides that "To *maintain and preserve* the ditches, drains, levees or other improvements made pursuant to this article and to *strengthen, repair and restore the same, when needed*"—(italics ours)—the district may levy *maintenance* taxes. And Sec. 12374 provides that when the works set out in the plan for reclamation are found insufficient to reclaim in whole or in part any or all of the land in the district, the board of supervisors may formulate new or amended plans containing new levees or for the enlargement of existing levees, and additional *benefit assessments* may be made under Sec. 12336, which covers the initial benefit assessments when the district is incorporated.

And finally, Sec. 12389, the last section of the article, provides in part: "This article is hereby declared to be remedial in character and purpose, and shall be liberally construed by the courts in carrying out this legislative intent and purpose."

These statutes were considered and applied in Graves v. Little Tarkio Drainage Dist., 345 Mo. 557, 568-70 (4-6), 134 SW. (2d) 70, 78-9 (8-14). As will be seen on a reading of that decision, the improvements made there were far more comprehensive than that proposed here. The decision says: "The condition of (that) district presented a serious situation. The plan of reclamation was not functioning. The levees were broken in many places; some ditches were filled in until hardly recognizable as a depression. The increased (external) floods from above were rapidly destroying the works of the district. The new board was ▬▬ faced with the duty of protecting and preserving the investments of the district." (Parentheses ours)

Continuing the opinion held the reconstruction of the ditches and laterals in that case was within the powers granted to the board of supervisors by Sec. 12370, supra, to *maintain and protect the existing plan for reclamation;* and was not referable to Sec. 12350, supra, which authorizes an amendment of the original plan for reclamation without court action, or to Sec. 12374, supra, which authorizes the board to formulate new or amended plans for reclamation. Under the first named Sec. 12370, the cost of the work is defrayed by a *maintenance* tax, whereas under Sec's 12350 and 12374 it is paid from benefit assessments.

We think the Graves case, supra, is controlling authority here. Appellants do not attempt to distinguish it, because they assume the construction of the "new" levee, as we have called it in this opinion, is new construction and not maintenance and preservation of the old levee. We do not agree. It does not change the original plan for reclamation with respect to any inherent defects therein, as contemplated by Sec's 12350 and 12374, supra. Neither does it attempt to provide new benefits. It simply seeks to continue the protection theretofore furnished by the original levee until subsequent external conditions rendered it insufficient in height and strength. Neither is the physical reconstruction of the original levee *new* construction in any fair sense. The additional dirt could not be deposited on top of it without destroying the graveled road thereon. And undoubtedly its height could not be increased without widening its base. So the so-called higher new levee was simply placed alongside the original levee as a part thereof. We rule this assignment against appellants.

Appellants' next assignment is that the *denial* by the Carroll county circuit court in 1944 of the district's petition to change its plan for reclamation so as to permit the building of the new levee was res judicata on the proposition that it has no right to do so now. We have already held no change in plan was necessary thereto. But following appellants' contention further. They cite Pearson Drain. Dist. v. Erhardt, 239 Mo. App. 845, 855(11,12), 201 SW. (2d) 484, 489(8). In that case the plaintiff district had sued the defendant for drainage taxes, and the court sustained the defense that it had no legal capacity to sue because its incorporation had been held void in a prior decision, which operated as an estoppel under the doctrine of res judicata.

We think the cited decision is not in point because the prior disability there was *permanent.* But here the evidence shows that in 1947—three years after the Carroll county circuit court had refused to change the plan for reclamation—flood waters from the Crooked and the Missouri rivers overflowed the respondent district's levee and submerged 20,000 acres, one-half of the land therein, and even covered part of a cemetery in or adjacent to Hardin. In these changed circumstances the refusal of the Carroll county circuit court three

years earlier to change the plan for reclamation could hardly be res judicata. And there is also a statement in respondents' brief that the ruling of that court in 1944 was induced by the testimony of objectors that another levee district (No. 4) contemplated raising its levee, whereby all the land in the territory would be protected—which was not done, as proven by the fact that that district's levee was washed out in 1947.

The general rule is: "The estoppel of a judgment extends only to the facts in issue as they existed at the time the judgment was rendered, and does not prevent a reëxamination of the same questions between the same parties where in the interval the facts have changed or new facts have occurred which may alter the legal rights or relations of the litigants. * *" 50 C. J. S., § 712b, p. 180. See also 34 C. J., § 1228(4), p. 808.

The statement in 30 Am. Jur., § 206, p. 943, is: "The mere change of facts subsequent to the rendition of a judgment does not necessarily affect the operation of such judgment under the doctrine of res judicata. ▆ * * However, where, after the rendition of a judgment, subsequent events occur, creating a new legal situation or altering the legal rights or relations of the litigants, the judgment may thereby be precluded from operating as an estoppel. In such case, the earlier adjudication is not permitted to bar a new action to vindicate rights subsequently acquired. In this connection, it has been declared that a judgment is not res judicata as to rights which were not in existence at the time of the rendition of the judgment. * * "

Appellants' next and final assignment on the merits is that the trial court erred in holding the respondent *could* obstruct the "natural drainage" and thereby damage their realty. They cite five decisions,[1] to which we have added four other authorities. The Bruntmeyer case was a suit for damages to plaintiff's crops on land *outside* the defendant district, caused by the discharge of water collected by its system of dikes, ditches and drains. The opinion says this water came from *water courses and* surface water which was discharged in volume on plaintiff's land. At the conclusion it states that if the district could thus collect "its surface water into one volume" and divert natural watercourses, and thus damage plaintiff without compensation, it would violate what is now Sec. 26, Art. 1,

---

[1]Bruntmeyer v. Squaw Creek Dr. Dist., 196 Mo. App. 360, 367(1), 194 SW. 748, 751(4); Greenwell v. Wills et al., 210 Mo. App. 651, 654-5(2), 239 SW. 578, 583(2); Farrar v. Shuss, 221 Mo. App. 472, 476(1), 282 SW. 512, 514(1); Labaddie Bottoms Dr. Dist. v. C. R. I. & P. Ry. Co., 226 Mo. App. 121, 126(1), 42 SW. (2d) 954, 956(1); State ex rel. Hausgen v. Allen, 298 Mo. 448, 459(2), 250 SW. 905, 907(3); Anderson v. Inter-River Dr.-Lv. Dist., 309 Mo. 189, 205-16(1, 3, 4, 5), 274 SW. 448, 453; Sigler v. Inter-River Drain. Dist., 311 Mo. 175, 195-208(1-4), 279 SW. 50, 55-9(1-4), Annotation, 5 A. L. R. (2d) 60; Keener v. Sharp, 341 Mo. 1192, 1195(1), 111 SW. (2d) 118, 120(3).

1120

Const. 1945. The decision was *limited* to land *outside* the district, by the Greenwell case,[1] and by the Hausgen case,[1] as to torts.

This left our law holding that owners of land outside the district could recover damages for overflow caused by drainage works regardless of whether the water came from natural watercourses, or was mere surface water, and notwithstanding Sec. 12349 of the instant drainage act provides a drainage district may "concentrate, divert or divide the flow of water in or out of said district." But a fundamental distinction was made later by the Anderson case[1] and followed in the Sigler case. It was this. As shown in 40 Words & Phrases (Perm. Ed.) p. 842, "Surface Water," there are fifteen Missouri decisions holding that overflow out of banks from rivers or other watercourses in times of flood is "surface water", as well as that produced by heavy rains or snows, etc. And we have always followed the common law doctrine that surface water is a common enemy, and that each land proprietor may ward it off though by so doing he turns it on his neighbor.

And so the Anderson case held that a drainage district is a governmental agency exercising the police power; and that as such it may fend off surface waters as a common enemy—in the protection of its own landowners, though the water be turned on the land of others outside the district. There is no evidence here that waters other than flood waters have been turned on the appellants, and the judgment of the trial court should be and is affirmed. All concur.