Mark BROWN, Plaintiff–Appellant,

v.

H & D DUENNE FARMS, INC., Donald B. French, Robert R. French, Sr., Frank S. French, Sr., Oliver B. French, III, Teresa F. Small, Jane G. Cross, Conservator for Joseph H. French, and William G. French, Defendants–Respondents.

No. 16365.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 21, 1990.

King E. Sidwell, Blanton, Rice, Sidwell and Ottinger, Sikeston, for plaintiff-appellant.

John L. Oliver, Jr., Oliver, Oliver, Waltz & Cook, P.C., Cape Girardeau, for defendants-respondents.

HOGAN, Judge.

Plaintiff Mark Brown and the named defendants own farmland located on Buffalo Island, an island which lies on the west side of the Mississippi River adjacent to Scott and Mississippi Counties in Missouri. Assuming (though such is not the case) that the Mississippi River runs north and south at this point, plaintiff's land lies north of the defendants' realty. Buffalo Island lies a short distance north of the confluence of the Mississippi and Ohio Rivers and is subject to what the parties call "headwater" flooding when the Mississippi rises and "backwater" flooding when both rivers rise simultaneously. In 1985 and 1986, defendants French and Duenne constructed a headwater flood control levee at the north line of the French property. This "new" levee, as it appears on plaintiff's exhibit 2, runs nearly perpendicular to the old levee system which had protected and drained Buffalo Island until 1973.

In February 1986 plaintiff Mark Brown brought this action in the Circuit Court of Scott County, averring that he and the defendants owned farmland located on Buffalo Island, "between the main line levee and the Mississippi River." Plaintiff further alleged that his land lay at an elevation above or "higher than" that of the defendants; that a natural watercourse, running generally north and south, traverses the parties' land, which is bounded on the west by Buffalo Island Chute and the mainline levee and bounded on the east by the west bank of the Mississippi River. Plaintiff further averred that the farmland owned by the parties was subject to "headwater flooding" by the Mississippi River and "backwater flooding" by the Ohio River.

It was further averred that the private levee constructed by the defendants in 1985 and 1986 traversed the farm of defendant Donald French and ran from east to west in such manner as to obstruct the flow of water through the channel on plaintiff's land onto and through the defendants' land. It was also alleged that construction of the private levee by the defendants had obstructed a natural channel and had rerouted the headwaters of the Mississippi River, damaging the Buffalo Island Chute which adjoins the plaintiff's land. Averring that he was entitled to a natural and unobstructed flow of water through the natural channel which traversed his land, plaintiff alleged that obstruction of the channel by the defendants had damaged his land in various ways, and averring further that he had demanded removal of defendants' levee, plaintiff prayed a mandatory injunction commanding removal of the levee, and further prayed that defendants be permanently enjoined from constructing or maintaining any structure which would interfere with the natural drainage of the watercourse which traverses plaintiff's land so as to cause water to flood or accumulate on the plaintiff's land.

In a second count plaintiff pleaded damages in the amount of $12,500 by reason of defendants' actions in construction of a levee which caused flooding of his property. In Count III, plaintiff repetitiously pleaded that the collection and diversion of water onto his land by the defendants was "unreasonable and reckless and constitute[d] negligence by defendants." Plaintiff prayed the same relief as that prayed

for in Count I of his petition. In a fourth count, plaintiff pleaded that the Buffalo Island landowners had been unable to agree as to the best method of protecting Buffalo Island against damage by flood. Prayer of this count was that commissioners be appointed to consider any and all matters not agreed upon by the "owners referred to herein" and to make recommendations to the court. It should be noted, however, that the case was tried on the theory that the plaintiff was entitled to a mandatory injunction.

The trial court heard a good deal of evidence and received many exhibits and, the record indicates, inspected the land involved in this case—with the consent of the parties—even though the court indicated at the outset that it was familiar with Buffalo Island. Extensive findings of fact and conclusions of law were made, and the court concluded: 1) that the plaintiff was not entitled to a mandatory injunction compelling removal of the levee constructed by the defendants; 2) that the plaintiff had adduced no adequate evidence of any monetary damage as alleged in Count II of the petition; 3) that plaintiff had not sustained his burden of proof as to Count III of the petition, but 4) the court had inherent equitable power and jurisdiction to take action to alleviate the parties' mutual and common problems, therefore: a) the parties were ordered to take such action as might be necessary to establish a circuit court levee district under the control of the Circuit Court of Scott County; b) upon formation of the levee district, it was to engage a specified primary engineer and technical consultants to establish relative levee heights and formations, and c) the court would retain jurisdiction of the cause to insure creation of the drainage district according to statute and equitable principles. The plaintiff has appealed.

Three assignments of error have been briefed. The plaintiff contends first that the court erred in denying a mandatory injunction ordering removal of the private levee because that levee obstructed a natural watercourse or drain way in that the drain way blocked had a well-defined channel, a bed and banks and a definite flow or current and a definite source and discharge. As a second point, plaintiff contends that the trial court erred in refusing to order removal of the private levee because the diversion of the natural flow of water constitutes an unreasonable burden upon the plaintiff which cannot be ameliorated except at inordinate expense to the plaintiff. Finally, the plaintiff contends that the trial court erred in ordering the formation of a circuit court levee district, designating an engineer and technical advisers rather than commissioners to consider matters upon which the landowners cannot agree, because such an order does not conform to the requirements of Chapter 245, RSMo 1986,[1] in that such an order cannot be binding upon landowners not parties to this action and in effect surrenders to the defendants the court's duty to resolve private drainage rights.

Having thus stated the issues raised by plaintiff's pleadings and the decree or judgment of the court, and having noted the points raised on appeal, there is a matter which we must note preliminarily. As we have said, the trial court heard a good deal of testimony and received a number of exhibits in evidence, but unfortunately the testimony is not correlated with the exhibits. One or two quotations from the record will illustrate our point. Plaintiff was called as a witness in his own behalf for the purpose, among others, of identifying his land on Buffalo Island. In the course of his direct examination, plaintiff was shown plaintiff's exhibit 53, which, it appears, is part of a map produced by the Army Corps of Engineers. Plaintiff's examination with respect to this exhibit ran thus:

\*　　\*　　\*　　\*　　\*　　\*

"Q. ... Mark, I'm going to show you some quadrangles which have collectively been identified as Plaintiff's Exhib-

---

**1.** References to statutes and rules are to RSMo 1986 and Missouri Rules of Court (18th ed. 1987) except where otherwise specifically noted.

it 53. Will you show to the Judge the area which is now commonly referred to as Buffalo Island?

A. The area—well, there's the word 'Buffalo Island' on here. The area that we are commonly referring to as Buffalo Island *encompasses an area which goes up here, which gets considerably slim north of this other island in the river here, from this area approximately up in here down to—you're getting close to the dry bayou area down in here, but it's somewhere—I believe the jurisdiction goes to about right in here where— this particular dash line—but it's in this area between here and here.*

Q. This is an area on the map which has been labeled as 'Powers Island,' *but this you have described to the Court today as [sic] south of what is labeled here as 'Powers Island'?*

A. Yes.

Q. *In fact, there's a red number 27 which is on the photograph, and it starts generally at that red number 27 and extends southward?*

A. Yes.

Q. Does it extend south to an area on the map labeled sliding tow head?

A. Yes.

Q. And that area is labeled on this map as Buffalo Island?

A. Yes.

Q. Show the Judge where your farm real estate is located.

A. *Here, as depicts Bunge Road, my farm is in this area right here, property line would be approximately right through here.*

Q. You have pointed to an area which has the word 'Buffalo' on it?

A. Yes, sir.

Q. *There is a red line extending east and west across the Cache quadrangle on Buffalo Island which has a red number 5 above it; is that correct?*

A. Yes, sir.

Q. *Does that red line correspond with what is shown as a green line on Plaintiff's Exhibit No. 1?*

A. Yes, sir. Yes, sir, it does.

Q. And that is what you have previously identified as a corner part of your farm; is that correct?

A. Yes. *That red line enters my property at this juncture, right where there is an elevation number there, below and slightly to the left of the number 5."* [Emphasis added.]

\*　　\*　　\*　　\*　　\*　　\*

A black and white copy of exhibit 53 has been filed as one of plaintiff's exhibits in this court. The filing of an accurate copy of an exhibit does not violate Rule 81.15, but the copy of exhibit 53 filed here furnishes no clue to the colored objects to which the plaintiff was referring, and otherwise his oral testimony is not correlated in any manner with the exhibit to which he seems to have been pointing. There is much other testimony of the same order in the record. Some of the testimony is indeed correlated with the exhibits, but much more is not. Essentially, we are presented with the same situation with which we were presented many years ago in *State v. Hill*, 373 S.W.2d 666, 670 (Mo.App.1963). Although this record is not so obscure and ambiguous that the cause must be remanded, as was true in *State v. Hill*, still, we are again presented with exhibits which bear no marks indicating what the witness meant when he answered "right here" or "up this way," and our ability to perform our proper appellate function is severely impaired. See *Welch v. Western Cas. & Sur. Co.*, 567 S.W.2d 743, 745 (Mo.App. 1978). We do not mean to lecture the able advocates who tried this case, for we appreciate that counsel, at the time of trial, is preoccupied with his burden of persuading the trier of fact. We are not inclined to reverse the cause, as we did in *State v. Hill*, 373 S.W.2d at 671, but we are remitted to the trial court's findings of fact to adjudicate the appeal on its merits. In this case, the trial court saw the witnesses, heard their testimony and personally viewed the part of Buffalo Island now in question. The record is sufficient to review the appeal on its merits, and we are mindful of our duty to make a final disposition of the cause, if that can be done. Rule 84.14.

To get a grasp of the controversy presented by this appeal, it is necessary to visualize Buffalo Island. The maps and diagrams we have before us indicate that Buffalo Island is a long, elliptical strip of land which lies west of the Mississippi River adjacent to the levee which is called the "mainline" levee by the parties to this action and by the trial court. Certain exhibits, such as plaintiff's exhibit 19, make it appear that Buffalo Island was once a series of islands out in the river itself; through a process of accretion and alluvium, those islands have become part of Scott and Mississippi Counties. The surface of Buffalo Island slopes generally from north to south, parallel to the river; the rate of descent is about one foot per mile and consequently the north part of the island is higher than the south. The island also slopes from east to west so that the east side is about ten feet higher than the west side. The island is bounded on the west side by a drain or watercourse referred to as the Buffalo Island Chute and what the parties refer to as the "mainline" levee.[2] We also infer that the Buffalo Island Chute is in fact a borrow pit from which earth has been taken from time to time to construct or repair levees.

In response to the averments of the plaintiff's petition, in particular Count I thereof, the trial court found that: 1) plaintiff was the owner of a farm located on Buffalo Island; 2) the defendants all owned farmland located on Buffalo Island below that of the plaintiff. In the circumstances here present, we consider it prudent to quote the trial court's findings, slightly paraphrased:

"5. ... Buffalo Island is the name given to the area on which all the parties ... own real estate. Buffalo Island [has] increased in size over [a period of] time by the gradual process of accretion and because it was attached to the main-

land. [One of the plaintiff's witnesses testified that] Buffalo Island has had its current shape, size and topography since sometime ... before 1935.

6. Buffalo Island has been farmed by the plaintiff and his predecessors in title, and by the defendants and their predecessors and others, in its present configuration and topography for well over 100 years, during all of which time Buffalo Island has, from time to time, been subject to the ravages of floods as a result of the headwater of the Mississippi River, or of water or floods [from the] Ohio River backing up the Mississippi River, or a combination of the two.

7. [In recent memory], the natural topography of Buffalo Island has [remained constant].... [There] is a natural slope following the slope of the Mississippi River (approximately one foot per mile) from the northern [end] of the island to [the south].... [As is true] of farmland adjacent to the river, there are low places and, in fact, the topography of the land [changes] from time to time [as the result] of a particular flood. The result of [a] particular flood on any [particular] land is not predictable.... [There] are [therefore] ridges or high places and low places throughout the island. The name given such topography is 'ridge and swale.'

Prior to changes effected by Cargill and Company and Bunge, and prior to the effects of the voluntary levee construction in 1958, surface water would generally run north to south with a flow west to the Buffalo Island Chute.

8. That in fact there is not now nor has there ever been a natural watercourse or dainway [sic] on Buffalo Island other than the Buffalo Island Chute which runs on the west side of Buffalo Island, essentially from a connection

---

**2.** We take it that the "mainline" levee is part of the system of levees constructed pursuant to the Mississippi Flood Control Act of 1928 and subsequent legislation. See 33 U.S.C.A. §§ 702e–702n (West 1986); *United States v. Sponenbarger,* 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230 (1939); *Danforth v. United States,* 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939). For our purposes, it is

sufficient to say that the Mississippi Flood Control Act was not intended as a self-executing assumption of complete control over all levees so as to divest the parties' "right of self defense" against floods through locally built levees. *United States v. Sponenbarger,* 308 U.S. at 268–269, 60 S.Ct. at 230[8].

point with the Mississippi River on the north, and westerly [sic] along the western boundaries of Buffalo Island curving back to the Mississippi River. The Chute as it now exists is also at the base of the "main line levee" owned and operated by Levee District No. 2.

9. That, in fact, the only watercourse or drainway [sic] on the island itself for the drainage of surface water was and is the Buffalo Island Chute.

10. That in 1958 Alfie Brown on the north, ... Lankheit, the Frenches, and the Duennes entered into an agreement for the construction of a private levee system. This levee system ... functioned with apparent success until plaintiff's predecessor ceased to maintain his [part] of the levee. The private levee was engineered by Berl LaPlant who has substantial experience in the engineering of and construction of private levee systems. Basically, this system consisted of a levee on the river [east] side [of the island] with a slope north to south [at] a gradient or fall of one foot [per] mile. It was ... intended to protect against a flood of 38 feet on the Cape Girardeau gauge. The second integral part of the private levee system was a smaller levee on the east edge of Buffalo Island Chute. This levee was substantially lower than the riverside levee.

The private levee system worked so that as a flood developed, the Buffalo Island Chute would fill with backwater from the south to the north, and ... as the level of the Mississippi River rose the water would gradually overtop the Buffalo Island Chute levee and gradually flood all of the protected land which, at the time, included Alfie Brown on the north, land now owned by the plaintiff; the Lankheit land; the Duenne land; the French land; and Hillhouse land to the south.

11. The court finds that the private levee system, as intended, and as long as properly maintained, served the function intended.

12. During this period, from at least 1935, it is clear that there were no streams or other water flowing on Buffa-lo Island. In fact, [one of the plaintiff's witnesses testified] there were no streams or water on Buffalo Island during his lifetime, except in a high water stage, in which case the water gets on the island [in either or both of two ways, that is] backup flooding through Buffalo Island Chute, or, when the river has from time to time topped, either [across] the riverside levee or the natural ridge at the north end of the island.

13. Before the construction by defendants of the levee in question in this case, the plaintiff's drainage or [sic] surface water was accomplished only when the level of water standing in the plaintiff's field dropped below the height of the Buffalo chute side levee. When this occurred, plaintiff had one thirty-inch culvert providing drainage from ˙[his] field into the Buffalo Island Chute. For the remaining drainage, plaintiff relied upon the natural gradient [to drain the water across the Lankheit and French] farms where the water was ultimately carried back to Buffalo Island Chute through a man-made ditch constructed on the French farm known as the 'Dynamite Ditch,' which ... also fed the Buffalo Island Chute.

14. The drainage of surface water south was not accomplished by any natural water courses or drainways [sic]. At best, there were depressions or swales in the land (the location and size of which would change as the land was periodically flooded), but [there was] no other mechanism for drainage other than the man-made ditches created by the plaintiff and by Berl LaPlant for Defendants French, i.e. the Dynamite Ditch.

15. At the time Berl LaPlant constructed the private levee system there were no natural drainways [sic] or water courses on the island other than Buffalo Island Chute.

16. In 1973 and again in 1984 and 1985 floods caused substantial damage to the land of the defendants. As a result of this, in 1985 and 1986, Defendants Duenne constructed a levee across the farm of Defendants French, running

generally east and west from the private levee on the east to the west edge of the Buffalo Island Chute. This levee was constructed by the Duennes on the land of the Frenches and with the consent of the Lankheits (in fact, Lankheits cooperated by providing soil for the levee), in order to protect the defendants from the ravages of headwater floods and scouring and deposits of sand which had become more and more frequent since the construction of the Cargill and Bunge Roads.

17. In 1963, on land owned by Alfie Brown to the north of plaintiff's land, Cargill constructed what is known as the Cargill Road. Cargill Road completely blocked the Buffalo Island Chute and by doing so changed direction of the water flow in the event of a headwater flood. Since 1963, on those occasions when there has been a headwater flood, no water has been able to enter the Buffalo Island Chute to the north, but has been forced by the Cargill Road out into the fields with current. That problem was compounded subsequently when the Bunge Corporation also constructed a road through the approximate middle of the plaintiff's land, which road, as shown by the photographs, essentially blocks the Buffalo Island Chute and since its construction in 1964 has also forced water from the natural watercourse Buffalo Island Chute out in the plaintiff's field.

18. In the seven years prior to the construction of the levee by the defendants, disputes arose between the plaintiffs [sic] and the defendants, particularly defendants Duenne, as to the plaintiff's failure to maintain the riverside and Buffalo chute side levees. In 1973 there was a major breach of the front line levee on plaintiff's farm, and substantial sand and other damaging deposits were made upon the Lankheit and the French land. As a result of that event, the Cargill and Bunge construction and subsequent floods, defendants constructed the levee in question to protect themselves.

19. That at the base of the levee defendants also constructed a drainage ditch with a large culvert into the Buffalo Island Chute. The effect of that ditch and culvert is to provide more in volume drainage back into Buffalo Island Chute than existed prior to the construction of the levee.

20. That there is no evidence that since the construction of the defendants' levee the backwater flood function of the private levee system has been affected.

21. ... The surface water problem which exists on Buffalo Island is a problem which has existed since at least the early 1900's when ... this island was farmed from top to bottom.

It is clear that once floodwater leaves the channels of the Mississippi it becomes surface water. The question then before the Court is the relative right of the plaintiff and of the defendants to deal with this surface water....

It is clear that the levee was constructed on Defendant French's land by Defendants Duenne with the help of French and with the concurrence and assent of Lankheit in order to protect the downstream land of French and Duenne from the ravages of headwater floods. It is clear that this levee was built entirely upon the French's land, and that in terms of man-made access to the only natural drainage on the island (Buffalo Island chute), the defendants provided more drainage to plaintiff than plaintiff had before in that defendants constructed a ditch and a 36–inch gaited [sic] culvert which provided flowage from the north side of their levee into Buffalo Island Chute. Before, plaintiff's drainage was dependent upon French's man-made ditch, its 20–inch culvert, and an entirely greater volume of water in that the drainage was shared by the Frenches and the Duennes. It is equally clear that for at least 40 years, according to plaintiff's evidence, this island had been cleared and farmed. Historical data indicates that originally there were two islands which grew together by the process of accretion. Once joined, they were cleared and farmed. [Witnesses Buck and Hesselrode], on the island since

1925, both confirm that there never has been drainage on the island whatsoever other than the Buffalo Island Chute. Any other drainage is man-made and there is no evidence that any man-made drainage, i.e. dynamite ditch, the plaintiff's placement of culverts, or the new culvert created by defendants was in the location of any watercourse or drainway [sic]."

Plaintiff's first point on appeal, as noted, is that the trial court erred in denying a mandatory injunction ordering removal of the private levee constructed by the defendants in 1985 because that levee obstructed a natural watercourse or drain way. The plaintiff has cited nine cases and one encyclopedia to support this argument, but as we are given to understand him, he relies essentially upon the rule, stated in some of the precedents, that one may not obstruct a natural watercourse without liability for ensuing damages to others, but one may otherwise treat surface waters as a common enemy and obstruct their flow without liability as long as he does so reasonably and not recklessly or negligently. See *Happy v. Kenton*, 362 Mo. 1156, 247 S.W.2d 698, 700–01[1] (Mo.1952).

■ We will say at the outset that we do not propose to discuss the law of surface water at length. The precedents cannot be reconciled and the disparate existing points of view concerning the law of surface water and its impoundment have been fully discussed elsewhere.[3] Also, we observe that both parties cite *M.H. Siegfried Real Estate v. City of Independence*, 649 S.W.2d 893 (Mo.banc 1983). *Siegfried* is a decision of our Supreme Court en banc, and it is ordinarily true that an opinion of the Supreme Court en banc on a proposition of law controls all subordinate tribunals, Mo. Const. Art. V, § 2 (1945), but an opinion of the Supreme Court which lacks concurrence of a majority of the judges except as to the result does not decide the issue and has value only as instruction. *Viquesney*

*v. Kansas City*, 305 Mo. 488, 497, 266 S.W. 700, 702[6] (banc 1924); *State v. Bradshaw*, 593 S.W.2d 562, 565[1] (Mo.App. 1979). The principal opinion in *Siegfried* was written by our present Chief Justice but only one judge concurred and two judges concurred in the result. *Siegfried*, therefore, is instructive but it does not finally determine the rights of the parties in this case.

■ The water with which we are concerned is overflow or floodwater. Our courts, noting a diversity of opinion, have consistently treated overflow water as surface water. *Keener v. Sharp*, 341 Mo. 1192, 1195, 111 S.W.2d 118, 120 (1937); *Goll v. Chicago & A. Ry. Co.*, 271 Mo. 655, 668, 197 S.W. 244, 247[2] (1917); *Shane v. Kansas City, St.J. & C.B. R.R.*, 71 Mo. 237, 247–48 (1879). See also *Dudley Special Rd. Dist. of Stoddard Cty. v. Harrison*, 517 S.W.2d 170, 179, n. 5 (Mo.App.1974); Snodgrass & Davis, supra, n. 3, Part I B, 24 Mo.L.Rev. at 143–145. It is therefore true that the law which applies to surface water also applies to overflow water in this jurisdiction, *City of Hardin v. Norborne Land Drainage Dist.*, 360 Mo. 1112, 1120, 232 S.W.2d 921, 926[4][5,6] (1950); Snodgrass & Davis, supra, n. 3, Part I B, 24 Mo.L.Rev. at 145, although other jurisdictions apply different rules to riparian owners with respect to floodwater. See generally Annot., supra, 23 A.L.R.2d at 751, § 2.

■ The plaintiff is not very specific concerning the particular drain way or watercourse which he claims has been blocked by the defendants' levee. Some of the exhibits filed indicate that at least some of the defendants have constructed a levee which runs across Buffalo Island, and that that levee is meant to ward off the overflow which sometimes covers Buffalo Island when the Mississippi River rises. What is not by any means clear is what natural drain or watercourse was blocked or obstructed by the defendants' levee. Both

---

**3.** See 6A *American Law of Property*, Chapter IV, pp. 156–202 (Casner ed. 1954); Snodgrass & Davis, *The Law of Surface Water in Missouri*, 24 Mo.L.Rev. 137, 281 (1959); Annot., *Right of riparian owner to construct dikes, embankments,* *or other structures necessary to maintain or restore bank of stream or to prevent flood,* 23 A.L.R.2d 750 (1952). There is much other literature on the subject.

the parties and the trial court wrestled with the definition of a "watercourse" or "natural drain way." In our view, a ditch may be a watercourse or drain way within the scope of the rule laid down in *Happy v. Kenton*, 247 S.W.2d at 700[1], if the ditch or channel serves the purpose of a natural drain or watercourse, even though the ditch or other channel was artificially constructed. See *Happy v. Kenton*, 247 S.W.2d at 703; 3 H. Farnham, *Waters and Water Rights*, § 827b, pp. 2430–31 (1904).

■ As we have said, and as our opinion probably indicates, the record laid before us is no model of clarity. We draw from the trial court's findings of fact that in 1958 all the parties or their predecessors in title constructed a private levee system on Buffalo Island. This system, the trial court found, worked well. Before the levee complained of was constructed, surface water drained from the plaintiff's land only when the level of water standing in plaintiff's field fell below the level of the "old private levee"[4] on the west side of the island. When this occurred, the surface water standing on plaintiff's land drained onto the land which belonged to the lower owners (defendants) through a 30–inch culvert which provided drainage from plaintiff's land into the Buffalo Island Chute. Remaining water was drained from the plaintiff's land because it followed the slope of the island southward and westward across farmland which belonged to one Lankheit and defendants French; this water was eventually carried back to the Buffalo Island Chute through a ditch constructed on the French farm.

The court specifically found that the drainage of surface water from Buffalo Island was not accomplished by natural watercourses or drain ways. It found specifically that at the time the private levee system was constructed there were no natural drain ways or watercourses on the island other than Buffalo Island Chute.

The defendants sustained substantial damage to their land as a result of floods which occurred in 1973 and again in 1984 and 1985. As a consequence, defendants

Duenne constructed a levee across the farm of defendants French. This levee runs east and west from the private levee on the east to the west edge of the Buffalo Island Chute. The trial court found that this levee was constructed by the Duennes on land which belonged to defendants French, with the consent and cooperation of the Lankheits, to protect the defendants from damage resulting from headwater floods, scouring and deposits of sand which had become more frequent since the construction of two roads going across Buffalo Island to grain elevators located on the northeast corner of the island. One of these elevators is referred to as the Cargill facility; the other is referred to as the Bunge "facility" or elevator.

The court further found that in 1963 Cargill constructed a road across Buffalo Island from west to east, and in so doing completely blocked the Buffalo Island Chute and the direction of the water flow in the event of a headwater flood. Since 1963, when the island has been subjected to a headwater flood, water has been forced onto the plaintiff's land by the access road which obstructed the natural flow from north to south and from east to west. This interference with the drainage of surface water on Buffalo Island was exacerbated when the Bunge Corporation constructed a road through the middle of plaintiff's land which has, since its construction, blocked the Buffalo Island Chute and has forced water from that watercourse out into the plaintiff's field.

The court further determined that in the seven years prior to the construction of the levee by the defendants, the plaintiff failed to maintain his part of the existing private levee system. In 1973, there was a major breach of one of the levees on plaintiff's farm, and substantial sand and other damaging deposits were left upon the Lankheit and French land.

Most important is the trial court's finding that the levee complained of was constructed to protect the lower owners against damage by headwater floods. The

4. So designated on plaintiff's exhibit 2.

court found it "clear" that the levee was built entirely on land belonging to defendants French, and that in terms of man-made access to the only natural drainage on the island—Buffalo Island Chute—defendants provided more drainage to the plaintiff than the plaintiff had before the new levee was constructed, because the defendants constructed a ditch and a 36-inch gated culvert which provided drainage from the north side of defendants' levee. The court concluded that the evidence did not support the conclusion that the volume of surface water which flowed across the plaintiff's land had been increased by the construction of the defendants' levee, and found no evidence that defendants' levee had obstructed a natural drain way. Consequently, the court denied a mandatory injunction.

■ It is apparent from a reading of *Looney v. Hindman*, 649 S.W.2d 207 (Mo. banc 1983), and *Siegfried*, 649 S.W.2d 893, that it would be imprudent for this court to attempt to state the broad general principles which govern the impoundment or diversion of ground waters. The obstruction of a natural drain way or watercourse gives rise to an action for trespass. *Looney v. Hindman*, 649 S.W.2d at 212; *Corrington v. Kalicak*, 319 S.W.2d 888, 892–93[4–7] (Mo.App.1959). Nevertheless the merits of this case depend upon the hydrography of the flooding which has caused the plaintiff's damage. The trial court was familiar with Buffalo Island and, as the defendants remind us, had the benefit of an on-site inspection of the land in question, by agreement of the parties. In this court-tried case, the scope of our review is limited by Rule 73.01(c) and the familiar strictures of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), which holds that appellate courts should set aside a decree or judgment as being against the weight of the evidence only when a review of the record generates a firm belief that the judgment or decree is wrong. Our review of the record generates no such belief.

■ The plaintiff's second point is that the court should have ordered removal of the defendants' levee because the defendants' diversion of the natural flow of water onto the plaintiff's land constituted an unreasonable burden upon the plaintiff in that canalization of the diverted flow has caused serious damage to the plaintiff's land which plaintiff cannot reasonably ameliorate.

In *Looney*, supra, 649 S.W.2d at 215, the court indicated that a plaintiff must establish some causal connection between the defendant's diversion of the natural flow of water and the damage plaintiff has sustained before the plaintiff may recover damages. There is no doubt that the plaintiff's land has been damaged by floods which have occurred on several occasions. The trial court's findings, however, negate the conclusion that it was the defendants' levee which diverted the flow of surface water so as to cause damage to the plaintiff's field or fields.

The trial court found that in 1963 an enterprise or business known simply as "Cargill" constructed a road across the north end of Buffalo Island in order to have access to its grain elevator, located next to the river on the east side of the island. This access road, known as Cargill Road, completely blocks the Buffalo Island Chute and has changed the direction of the flow of water when there is a headwater flood. Since 1963, the court found that on those occasions when there has been a headwater flood, the Buffalo Island Chute has been blocked by the Cargill road and consequently the water has been forced out into the fields. A similar road constructed by the Bunge Corporation has also forced floodwater onto the plaintiff's land. The court also found that plaintiff had failed to maintain his part of the private levee on the east and west side of the island. In 1973, there was a major breach of the so-called front line levee on plaintiff's farm, and sand and other deposits were cast upon the Lankheit and French land. Thereafter, the defendants constructed a levee to protect themselves.

This point is, of course, a reargument of the evidence. In our view, the evidence raised a question of fact whether the defen-

dants' levee or some other cause created an accelerated and increased flow of surface water onto the plaintiff's land. Once again, we cannot say that a review of the entire record creates a firm belief that the judgment or decree was wrong. The point is denied.

The plaintiff's final point is that the trial court erred and exceeded its jurisdiction in entering the following order as part of its decree:

"The Court further finds that this action having been instituted in equity, the Court has inherent equitable power and jurisdiction to require the parties to take action to alleviate and solve their mutual and common problems.

WHEREFORE, it is the ORDER of this Court that:

1. The plaintiff and the defendants execute such documents as may be necessary, and undertake such actions as may be necessary and proper to establish a Circuit Court Levee District under the authority and control of this Court as in such cases made and provided.

2. That upon the formation of such levee district, the District shall engage Martin Lucas as its primary engineer and shall also engage Woodward–Clyde who shall act as technical consultants for Martin Lucas to establish relative levee heights and formations.

3. That this Court shall thereafter retain jurisdiction over this matter to insure the existence and operation of said drainage district in accordance with statute and general equitable principles."

The plaintiff's final assignment of error, directed to that part of the court's order just cited, is that the court erred in ordering the formation of a circuit court levee district and in designating an engineer and a technical consultant rather than commissioners to consider matters not agreed upon by the owners because the trial court's order does not conform to the requirements of Chapter 245, "in that such an order cannot be binding upon landowners not a party to this action and in effect surrenders to [the defendants] the

function of the court of resolving private drainage rights."

■ Section 245.015 authorizes the owners of a majority of the acreage in any contiguous body of swamp, wet or overflowed land, among others, to form a levee district for various purposes including protection of the land from the effects of wash or bank erosion. No authority is cited for the proposition that a circuit court may order the formation of a circuit court levee district without being requested to do so in the manner prescribed by § 245.015. We believe the order to form a circuit court levee district was invalid in this case simply because it is apparent that the interest of persons or corporations, e.g., the owners of the grain elevators, would be affected by such an order although they were not involved in this litigation. As a general principle, it has been held that in an equitable proceeding, no decree will be entered which will materially and necessarily affect any person's interest in the property involved in the litigation, unless he has been made a party and afforded the opportunity to be heard in defense of his rights. *Schaeffer v. Moore,* 262 S.W.2d 854, 858[3] (Mo.1953). More specifically, it has been held that under prior and similar statutes, the procedure prescribed for the formation of a levee or drainage district must be literally followed. *State ex rel. Harrison v. Hill,* 212 Mo.App. 173, 184, 253 S.W. 448, 452 (1923). As the court observed in that case, the landowners affected have the right to a hearing and their day in court. The trial court erred and exceeded its authority in ordering the formation of a circuit court levee district.

■ In connection with the plaintiff's suggestion that disinterested commissioners should have been appointed pursuant to § 244.020, after plaintiff gave a notice of objection to the defendants' construction of a levee, we will say that we do not interpret the provisions of Chapter 244 to require the court to appoint commissioners pursuant to § 244.020.1. Nothing found in Chapter 244 precludes a landowner's asserting his rights in an action for injunctive relief. See *Senkevech v. Vaughn,* 610

S.W.2d 399, 403[4] (Mo.App.1980). The plaintiff tried the case on the theory that he was entitled to mandatory injunctive relief. An appellate court will not review a case on a theory different from that on which it was tried. *State ex rel. Reynolds County v. Riden,* 621 S.W.2d 366, 368 (Mo. App.1981); *Teson v. Vasquez,* 561 S.W.2d 119, 132 (Mo.App.1977). That part of the judgment which orders the establishment of a circuit court levee district and purports to retain jurisdiction until the district is established is reversed; in all other respects the judgment is affirmed. It is so ordered.

FLANIGAN, P.J., and MAUS, J., concur.

SHRUM, J., not participating because not a member of the court when cause was submitted.